IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,604

STATE OF KANSAS,
*Appellee*,

v.

MARCUS G. BUTLER,
*Appellant.*

SYLLABUS BY THE COURT

1.

Alternative means are legislatively determined, distinct, material elements of a crime, as opposed to descriptions of the material elements or of the factual circumstances that would prove the crime.

2.

K.S.A. 2012 Supp. 21-5302 does not set forth alternative means for committing an overt act in furtherance of a conspiracy.

3.

Under the facts of this case, it was legally appropriate for the court to instruct the jury it had to find the defendant committed the crime of conspiracy to commit aggravated robbery knowingly rather than intentionally.

4.

Whenever a court admits evidence pursuant to K.S.A. 60-455, it must give a limiting instruction informing the jury of the specific purpose for admission. The goal of

a limiting instruction is to eliminate the danger that jurors will consider the evidence to prove the defendant's mere propensity to commit the charged crime.

5.

Appellate courts use a two-step process to evaluate claims of prosecutorial error—simply described as error and prejudice. To determine if the prosecutor erred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If the court finds error, the burden falls on the State to demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility the error contributed to the verdict.

6.

Under the facts of this case, the prosecutor's characterization of the defendant's theory of the case as "ridiculous" was a fair comment on the evidence.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed April 27, 2018. Convictions affirmed, sentence vacated in part, and case remanded with directions.

*Kai Tate Mann*, of Kansas Appellate Defender Office, argued the cause, and *Kimberly Streit Vogelsberg*, of the same office, was on the brief for appellant.

*Christopher L. Schneider*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Marcus G. Butler directly appeals his convictions—first-degree felony murder, conspiracy to commit aggravated robbery, and attempted aggravated robbery. He alleges multiple reversible errors, but after a thorough review, we affirm Butler's convictions.

Butler also argues—and the State concedes—the district court erred by sentencing him to lifetime postrelease supervision instead of lifetime parole for his first-degree felony-murder conviction. We agree this was error. We vacate this portion of Butler's sentence and remand the case to the district court so the court may impose lifetime parole.

FACTUAL AND PROCEDURAL BACKGROUND

Shortly after 7 p.m. on January 9, 2013, Kevin Smith returned home from work to the apartment he shared with his fiancée, Demetria Hunter, in Wyandotte County. When Smith arrived, he discovered a vehicle parked in his spot. Hunter and Smith's neighbors had a history of parking in their stalls and making loud noises. Smith saw a white male— later identified as Clint Schierbaum—exiting the neighboring apartment. Smith questioned him about the vehicle, but Schierbaum told him he did not know who owned the vehicle and left.

About 15 minutes later, Hunter and Smith heard a series of loud popping or banging noises coming from the neighboring apartment. Smith later testified he heard two sets of pops about seven to ten minutes apart. Hunter, on the other hand, stated when she heard some banging noises, she "beat on the wall . . . and all of a sudden I just kept hearing bang, bang, bang on the wall."

3

Hunter called the police to register a noise complaint. She and Smith stepped out of their front door to investigate. Three white men emerged from the neighboring apartment. When Hunter tried to confront them about the noise, the group hurried past them, climbed into a vehicle, and left. Hunter thought one of the men appeared afraid.

Law enforcement officers arrived shortly thereafter. After they spoke with Smith and Hunter, Nick Rhodes—a resident of the neighboring apartment—arrived on the scene. Rhodes told the officers his roommates had informed him a shooting had occurred in the apartment. Rhodes gave the officers permission to search the apartment.

The officers discovered two men in an upstairs bedroom, both of whom had been shot. Matthew Gibson—who was lying on the floor—was dead. A forensic pathologist later testified Gibson died from multiple gunshot wounds, including one to the head and two to his abdomen. Officers recovered a .357 caliber revolver resting on the floor next to Gibson, which was later identified as his revolver. The revolver had one empty cartridge casing in it, while the remaining cartridges were loaded.

Leland Pruneda was lying on the bed. Pruneda had been shot in the back of the head but was still alive and conscious. Officers located a .40 caliber semiautomatic handgun resting on the bed next to Pruneda. The gun's magazine contained loaded rounds, but the chamber was empty. Officers later recovered several .32 caliber shell casings from the bedroom. After calling for medical personnel, an officer tried to question Pruneda, but he was too disoriented to give an account of what happened. Pruneda was transported to the hospital for treatment.

According to Schierbaum, he arrived at the apartment earlier that day around 7 p.m. to buy a gram of marijuana from Nick Yanos. Schierbaum entered the apartment through the unlocked front door and went upstairs to Yanos' bedroom, where Yanos typically sold marijuana. Schierbaum testified Yanos usually left the front door unlocked.

4

A couple minutes after he arrived, two other individuals—Bryce Meyn and Brandon Eberth—arrived to buy marijuana from Yanos. All four men smoked some marijuana together.

Pruneda and Gibson then arrived together, and all six of them congregated in Yanos' bedroom. The six men knew each other from high school and were cordial with each other. A few minutes later, Schierbaum left with his marijuana through the front door where he was confronted by Smith about the vehicle parked in Smith's spot.

At this point, five people were in the bedroom—Pruneda, Gibson, Eberth, Meyn, and Yanos. Not long after Schierbaum left, Eberth heard the footsteps of somebody walking up the apartment stairs. Eberth and Meyn testified a black male wearing a ski mask and brandishing a pistol ascended the stairs. He pointed the pistol at the group and told them to get on the ground. Eberth—assuming they were being robbed—went to the ground, pulled out his wallet, and held it out for the man. Meyn also went to ground. Several shots were fired, and the assailant fled the apartment.

Pruneda remembered hearing someone tell them to "get the fuck down," and he looked right before being shot in the back of his head. While at the hospital the following day, Pruneda told an officer a single black male wearing a ski mask entered the apartment and shot him during the course of a robbery.

After the assailant fled, Gibson was hunched over by a dresser groaning and bleeding. Pruneda was also injured and bleeding, though he was talking. Afraid, Meyn, Eberth, and Yanos left the apartment in a hurry. Yanos took his marijuana with him. As the three men exited the apartment, they passed Smith and Hunter, who were yelling that they had called the police. The three men loaded into Eberth's vehicle and left. Yanos threw his marijuana out of the car, and they eventually returned to the apartment and spoke with the police officers who were present when they arrived.

At this point in time, law enforcement did not have a lead on the shooter's identity. But on January 14, 2013, officers received a phone call from Beau Barger who claimed he had information related to the shooting. Barger implicated his coworkers, Marcus Butler and Tyler Jewell. Kyle Cole, another coworker, later provided law enforcement with corroborating information. The State charged Butler with one count each of first-degree felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery.

The district court held a three-day jury trial. The State called 16 witnesses to testify, including Schierbaum, Meyn, Eberth, Pruneda, Cole, Barger, Smith, and Hunter. Jewell, who claimed to have been Butler's accomplice, also testified for the State.

Barger told the jury he, Butler, Jewell, and Cole worked in the automotive detail department at Zeck Ford—a car dealership in Leavenworth, Kansas. Barger knew Yanos and those present in the apartment on January 9, 2013, from high school. He also knew Butler purchased marijuana from Yanos. About one month before the shooting, Butler told Barger he was upset with a purchase from Yanos and he wanted to rob Yanos. Barger advised against doing so, believing it would be pointless. About one week before the shooting, Butler again approached Barger and said he wanted to rob Yanos.

On the night of the shooting, Barger claimed he had learned about the events through Cole. The next morning at work, Butler pulled Barger into a room and told him he had shot "him." By this time, Barger knew Gibson was dead. Butler told Barger that after he entered the house, he found four or five people in a room, told everyone to get down, and when he heard shots and saw flashes, Butler began shooting until he "[e]mptied the clip." Butler allegedly warned Barger to not tell anyone else about the shooting. Because he was afraid of what Butler might do to him, Barger waited a few days before calling the police.

6

Cole told the jury that about one month before the shooting, Butler approached him looking for someone who sold marijuana. Cole purchased marijuana from Yanos, so he referred Butler to Yanos. Like Barger, Cole knew Yanos and those present in the apartment from high school. Cole knew Butler had purchased marijuana from Yanos "a couple times."

Later, Butler approached Cole four or five times and asked Cole to help him rob Yanos. Butler wanted to know how much money Yanos kept on him and whether he had any guns. According to Cole, he refused to help Butler and told Butler not to rob his friends.

On the day of the shooting, Jewell warned Cole not to go to Yanos' house that evening because Butler was "gonna run up in there." Cole claimed he thought Jewell was joking. Later that night, Cole received a frantic phone call from Jewell's phone. Jewell told Cole:  "[W]e were not there tonight . . . you don't know anything. If you say anything, we will find you." Butler then came on the line and told Cole:  "We were not there tonight, you don't know anything. There was no evidence tracing back to him." Cole claimed Butler threatened to find him and "beat [his] ass" if he told anybody it was them. Butler also asked Cole to tell him where he and Barger were, presumably because they were the only ones who knew about Butler's plan to rob Yanos.

Two days later, Cole returned to work where Butler pulled him aside to a break room to have a private conversation. Butler told Cole "he ran up in there and they pulled a gun out so he just started shooting." Butler allegedly told Cole there was no evidence linking him to the crime, only he and Barger could implicate him, and Butler wanted to "make sure [they] would keep [their] mouths shut." Cole believed Butler was trying to intimidate him. The conversation concluded when their boss entered the room.

7

Days later, Cole received a phone call while at work from a number he did not recognize. Cole claimed he answered the call over the speakerphone while Jewell was working next to him. It was a police detective who asked him to come to the police department for questioning. After Cole hung up, he claimed Jewell "started freakin' out" and told Cole that he could not go to the police department. Jewell later denied ever overhearing a phone call. Cole claimed Jewell then left work to pick up Butler and bring him back to work.

When Cole left work, he discovered Butler and Jewell waiting by his vehicle in Jewell's pickup truck. They instructed Cole to get into the truck, and once he was inside, they told him, "[Y]ou can't go in there, you can't say shit, you don't know anything. Where's [Barger]? Call [Barger], I need to know where [Barger] is." Cole told them he would remain silent, but after he exited the truck, Cole went to the police station and gave a statement.

Jewell was the State's final witness. He testified pursuant to a plea agreement. The State originally charged Jewell with the same counts as Butler—first-degree murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery. In exchange for his testimony, the State amended the charges to one count of second-degree murder, to which Jewell pled guilty.

Jewell bought marijuana from Yanos and knew Butler purchased marijuana from Yanos on a weekly basis. Jewell would occasionally accompany Butler to Yanos' apartment so they could both buy marijuana. Jewell and Butler were friendly with each other and would hang out outside of work.

Shortly before the shooting, Jewell heard Butler talking to Cole and Barger about how Yanos was "short[ing]" him on marijuana. Butler thought Yanos was selling him "shake weed" instead of "solid nuggets." The afternoon of the shooting, Jewell and Butler

8

spoke on the phone about going to Yanos' apartment and robbing him of his marijuana and money. Butler did not own a vehicle at the time, so he asked Jewell to drive him to Yanos' apartment.

Around 4 or 5 p.m. that day, Jewell spoke with Butler to let him know that he would help with the robbery. Jewell testified he agreed to help Butler because he wanted to scare Yanos. To him, Yanos "was a punk kid selling weed," and he wanted to "bring him down a notch." After Butler finished work around 6:45 or 7 p.m., Jewell picked him up from the dealership. From there, Jewell drove them to Yanos' apartment. On the way there, they stopped at a gas station, and Butler paid for Jewell's gas in exchange for driving him to the apartment. Butler was wearing black jeans, a black hoodie, black and white shoes, and he had a ski mask rolled up on the top of his head.

On the drive to the apartment, Butler and Jewell discussed their plan. They decided to both enter the apartment; Butler was supposed to go upstairs and rob Yanos while Jewell remained downstairs to keep a lookout. Jewell noticed on the ride to the apartment Butler had a silver and black handgun in his lap. When they arrived, Jewell parked down the street, so Yanos could not see his truck. According to Jewell, they waited in the truck until they received a text message from Cole letting them know Yanos was home.

While it was dark, Butler and Jewell exited the truck and walked to Yanos' apartment. Butler entered the front door—which was unlocked—and Jewell followed behind him. As they entered the front door, Butler pulled the ski mask down to cover his face. Some of Butler's skin was visible through the mouth and eye holes of the mask. Both Meyn and Eberth told the jury they could see the color of the shooter's skin from around the openings in the ski mask.

Jewell, who was unarmed, checked the downstairs living room to make sure nobody was present and then remained by the front door. Butler walked up the stairs with the gun in his hand, which Jewell saw Butler carrying when they entered the building. As he ascended the stairs, Jewell heard Butler cock the weapon and yell for everyone to get on the ground. He then heard feet stomping followed by at least 10 gunshots, at which point Jewell fled for the truck. Jewell heard Butler running behind him, and when they reached the truck, Jewell drove them to an apartment in Kansas City, Missouri, near the Sprint Center.

While Jewell was driving, Butler told him what had happened:

"[W]hen he went up the stairs, the dude stood up and walked towards him and he pushed him and he grabbed some dude and put him up against the wall. Out of the corner of his eye he saw a dude stand up with his gun to shoot at him and he said he missed, that's when he grabbed him and started shooting him."

Butler also told Jewell when he fired his gun, he "didn't miss." While on their way to the apartment, Jewell called Cole from his cell phone. Butler also spoke with Cole, but Jewell could not recall the details of what was said. On cross-examination, Jewell denied ever threatening Cole or Barger. Once at the apartment, they disposed of their belongings. Jewell saw Butler place the gun into a bag. They remained at the apartment for about half an hour and then returned to Leavenworth. Jewell dropped Butler off at his apartment and went home.

Jewell went to work the next day, where he spoke with both Cole and Barger. Jewell claimed he simply apologized to them. After Cole received a call from the police, Jewell recalled speaking with Cole and Butler in his vehicle outside of work. Not long after, Jewell received a phone call from the police, asking him to come to the station for

10

questioning. He then had his girlfriend drive him to the police station where he waived his *Miranda* rights and confessed.

Following Jewell's testimony, the State rested. Butler moved for a directed verdict, which the court denied. Butler rested without presenting any evidence. The jury ultimately found Butler guilty as charged. The court did not poll the individual jurors, but asked the jury, "[S]o say you all?" The jury responded, "Yes."

The day after Butler was convicted, his trial counsel filed a motion for new trial and memorandum in support, alleging several trial errors. Over two weeks later, Butler submitted a motion for ineffective assistance of counsel, asserting several deficiencies in his trial counsel's performance. Nearly one month later, Butler filed a pro se motion asking for a new trial, in which he primarily argued his trial counsel was ineffective for not calling an alibi witness.

On November 24, 2014, the district court held a preliminary hearing on the motions. The court stated it had received "a lot of correspondence" from Butler claiming he was unhappy with his trial counsel. Butler told the court he had communication issues with counsel throughout trial and claimed his girlfriend, Erin Davis, was "constantly trying to get in contact with him" and would have provided him with an alibi. Thereafter, the court allowed trial counsel to withdraw and appointed new counsel.

Nearly eight months later, Butler's new counsel filed an "amended/supplemented motion for new trial." The motion incorporated the arguments raised by Butler's trial counsel and further argued trial counsel was ineffective (1) by failing to investigate the presence or absence of DNA and other forensic evidence at the crime scene; (2) by neglecting to subpoena phone records and time cards from the dealership; (3) by failing to investigate a gun once located in a Leavenworth pawn shop that Butler believed may

11

have belonged to the actual shooter; (4) by not calling his girlfriend as an alibi witness; and (5) by failing to generally investigate Butler's case.

The district court conducted an evidentiary hearing, during which Butler's trial counsel testified. Following the testimony, Butler's new counsel also advised the court Butler believed his "uncharged bad acts" of the unsuccessful solicitations of and threats toward Barger and Cole "should not have been brought up."

The court ultimately denied Butler's motion for new trial. It first outlined the evidence presented at trial and determined there was sufficient evidence to support each of Butler's three convictions. Next, the court found Butler did not provide his trial counsel with an alibi witness and trial counsel had numerous contacts and visits with Butler. The court dismissed Butler's concerns over potential DNA evidence because his position at trial was that the State could not provide any DNA or other physical evidence tying him to the shooting. It further reasoned because there was testimony Butler had previously been in the apartment to purchase marijuana, trial counsel understandably would not want to search for and possibly unearth Butler's DNA in the apartment. The court found the remaining information requested by Butler irrelevant. Lastly, the court held a limiting instruction regarding Butler's other bad acts was not warranted because his unsuccessful solicitation of and threats to Cole and Barger were "part and parcel" of the events that occurred that day.

Immediately thereafter, the district court sentenced Butler to life in prison without the possibility of parole for 20 years for the first-degree felony murder and imposed consecutive 32-month sentences for the attempted aggravated robbery and conspiracy to commit aggravated robbery. The court also imposed lifetime postrelease supervision.

Butler timely appealed his convictions and sentence to this court. See K.S.A. 2012 Supp. 22-3601(b)(3) (providing for direct appeal to the Supreme Court from a district court's final judgment when a maximum sentence of life imprisonment has been imposed).

ANALYSIS

*K.S.A. 2012 Supp. 21-5302 does not set forth alternative means for committing an overt act in furtherance of a conspiracy.*

Butler first argues his conviction for conspiracy to commit aggravated robbery must be reversed because there was insufficient evidence to support a finding of guilt on each of the various alternative means for committing the overt act in furtherance of the conspiracy. "Alternative means issues arise when the statute and any instructions that incorporate it list distinct alternatives for a material element of the crime." *State v. Sasser*, 305 Kan. 1231, 1239, 391 P.3d 698 (2017); *State v. Brown*, 295 Kan. 181, 184, 284 P.3d 977 (2012) ("We hold that a statute—and any instruction that incorporates it—must list distinct alternatives for a material element of the crime, not merely describe a material element or a factual circumstance that would prove the crime, in order to qualify for an alternative means analysis and application of the super-sufficiency requirement."). "Alternative means are legislatively determined, distinct, material elements of a crime, as opposed to legislative descriptions of the material elements or of the factual circumstances that would prove the crime." *State v. Foster*, 298 Kan. 348, Syl. ¶ 4, 352, 312 P.3d 364 (2013).

If this is an alternative means case, we must conduct what we have termed a "super-sufficiency" analysis. That is, sufficient evidence must support each of the alternative means charged to ensure that the verdict is unanimous as to guilt. *Brown*, 295 Kan. at 188; see *State v. Bolze-Sann*, 302 Kan. 198, 208, 352 P.3d 511 (2015)

13

("'"'[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means."'"').

But if the case does not involve alternative means, the question of jury unanimity is not implicated. See *State v. Swint*, 302 Kan. 326, 336, 352 P.3d 1014 (2015). Therefore we must initially consider whether the jury was ever presented with an alternative means case. The determination of whether a case involves alternative means is usually a question of statutory interpretation subject to unlimited review. See *State v. Williams*, 303 Kan. 750, 757, 368 P.3d 1065 (2016).

The rules of statutory interpretation and construction are well known:

"The touchstone of statutory construction is legislative intent, and to divine this intent we first examine a statute's plain language to determine whether it describes alternative means by listing 'alternative distinct, material elements.' The legislature typically signals its intent to create an alternative means by 'separating alternatives into distinct subsections of the same statute.' [Citations omitted.]" 303 Kan. at 757.

Kansas law defines conspiracy as "an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator." K.S.A. 2012 Supp. 21-5302(a). Conspiracy is comprised of two elements: "'(1) An agreement between two or more persons to commit or assist in committing a crime and (2) the commission by one or more of the conspirators of an overt act in furtherance of the object of the conspiracy.'" *State v. Hill*, 252 Kan. 637, 641, 847 P.2d 1267 (1993).

14

Notably, the statute does not list alternative ways a fact-finder could conclude the defendant committed an overt act in furtherance of the conspiracy; it simply states a conviction cannot occur unless an overt act is alleged and proved. Indeed, the language upon which Butler bases his alternative means claim does not appear in K.S.A. 2012 Supp. 21-5302. "That alone indicates the legislature never intended for cases like [defendant's] to be alternative means cases." *Williams*, 303 Kan. at 758. Instead, the Legislature has seen fit to leave the question of what constitutes an overt act to the judicial process. See, e.g., *State v. Mays*, 277 Kan. 359, 385, 85 P.3d 1208 (2004) (holding there was sufficient evidence to find the defendant committed overt acts in furtherance of a conspiracy to commit first-degree murder by obtaining a weapon and driving around looking for victims). Thus looking solely to the plain language of K.S.A. 2012 Supp. 21-5302, we conclude the statute does not set forth alternative means for committing an overt act. See *State v. Cottrell*, 53 Kan. App. 2d 425, 433, 390 P.3d 44 ("A plain reading of the language in the conspiracy statute reflects that the legislature did not intend to create more than one distinct way in which a defendant can commit an overt act."), *rev. granted* 306 Kan. 1322 (2017).

Butler also directs our attention to Instruction 19, which read:

"The defendant is charged in Count III with Conspiracy to Commit Aggravated Robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant agreed with another person to commit or assist in the commission of aggravated robbery.

"2. The defendant did so agree with the intent that aggravated robbery be committed.

15

"3. The defendant or any party to the agreement acted in furtherance of the agreement *by discussing and planning the aggravated robbery, arrived at the location, and carried out the plan.*

"4. This act occurred on or about the 9th day of January, 2013, in Wyandotte County, Kansas." (Emphasis added.)

The complaint alleged the same series of overt acts.

Butler isolates the particular phrase, "discussing and planning the aggravated robbery," arguing this alone could never—as a matter of law—constitute an overt act in furtherance of a conspiracy. See *State v. Crockett*, 26 Kan. App. 2d 202, Syl. ¶ 6, 205, 987 P.2d 1101 (1999) (reversing a defendant's conviction for conspiracy to commit first-degree murder where the complaint only listed "planning on the time, location and manner of killing" as the overt act in furtherance of the conspiracy).

Butler begins his argument by claiming the "district court instructed the jury that to be guilty, Mr. Butler, or any other party to the agreement, committed *any of* the following overt acts: by discussing and planning the aggravated robbery, arrived at the location, and carried out the plan." (Emphasis added.) Butler wrongly characterizes the court's instructions. The court told the jury it must find "each of" the elements must be proved, which included: "The defendant or any party to the agreement acted in furtherance of the agreement by discussing and planning the aggravated robbery, arrived[*sic*] at the location, and carried[*sic*] out the plan."

Appellate courts consider "'jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury.'" *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014). When looking at the third element in its entirety, Butler fails to recognize "discussing and planning" is only

16

one part of the entire series of acts alleged by the State, which is connected by the coordinating conjunction, "and." Therefore in order to find Butler guilty of conspiracy to commit aggravated robbery, the jury had to find he or Jewell discussed and planned the aggravated robbery, *and* arrived at the location, *and* carried out the plan. These are not alternative means but simply a sequence of events which collectively make up the alleged overt act.

Butler relies on *State v. Enriquez*, 46 Kan. App. 2d 765, 266 P.3d 579 (2011), in which a jury found a defendant guilty of conspiracy to commit first-degree murder. The district court in that case instructed the jury it could find Enriquez or any party to the agreement acted in furtherance of the agreement by:

> "a. Purchasing tools at two locations in Dodge City, Kansas; or

> "b. Requesting additional members to be part of the plan; or

> "c. That the defendant, Noel Trejo-Medrano, and Joel Mendoza-Soto traveled from Nebraska to Dodge City, Kansas, to put the plan into place[.]" 46 Kan. App. 2d at 772-73.

No unanimity instruction was given. After noting that no other Kansas appellate court had addressed this issue, the Court of Appeals held that the jury was presented with three alternative means by which Enriquez or another party could have committed an overt act. *Enriquez*, 46 Kan. App. 2d at 775-76. Nonetheless, the panel affirmed Enriquez' conviction because it found beyond a reasonable doubt a rational juror could find each overt act occurred. 46 Kan. App. 2d at 776-77.

In *State v. Smith*, 268 Kan. 222, 230, 993 P.2d 1213 (1999), we expressed concern when a jury is given a list of possible overt acts—any of which may satisfy the overt act requirement—"a danger could exist that the jury was not unanimous as to the act or acts

it relied upon for the conviction." In *Smith*, however, we found no error where the jurors were individually polled, and the jury affirmed it was unanimous as to the particular overt act. 268 Kan. at 230.

But resolving Butler's claim does not necessitate an analysis of whether *Enriquez* and *Smith* remain valid after our decision in *Brown*, 295 Kan. 181, in which we established a statutory test for determining if alternative means existed. Butler's case presents a distinguishable set of facts. As previously discussed, the State alleged a string of connected events to satisfy the overt-act element. Accordingly, we hold this is not an alternative means case and the super-sufficiency standard does not apply.

Butler nonetheless argues there was insufficient evidence to support the overt act (comprised of a sequence of events) alleged by the State. When the defendant challenges the sufficiency of the evidence supporting a conviction, the standard of review is whether, after reviewing all the evidence in a light most favorable to the State, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In making such a determination, appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Brown*, 305 Kan. 674, 689, 387 P.3d 835 (2017).

At trial, Jewell testified he and Butler spoke on the phone in the afternoon of January 9, 2013, about robbing Yanos of his marijuana and money. Shortly thereafter, they spoke again on the phone, and Jewell told Butler he would assist in the robbery. And while they were travelling to Yanos' apartment, Butler and Jewell hatched their plan— Butler would go upstairs and rob Yanos while Jewell remained downstairs as the lookout. Jewell then provided the jury with detailed testimony of the botched robbery and the events after they fled the apartment. Barger and Cole testified Butler confessed to them about the events of the failed robbery. Viewing the evidence in a light most favorable to the State, there is sufficient evidence to support the series of overt acts alleged.

18

*The district court correctly instructed the jury that it had to find Butler committed conspiracy to commit aggravated robbery knowingly rather than intentionally.*

Butler next challenges the jury instructions for conspiracy to commit aggravated robbery. When a jury instruction is alleged to be erroneous,

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

Because Butler is asserting an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. See K.S.A. 2012 Supp. 22-3414(3); *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016).

The district court instructed the jury regarding conspiracy to commit aggravated robbery as follows:

"INSTRUCTION NO. 19

"The defendant is charged in Count III with Conspiracy to Commit Aggravated Robbery. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

19

"1. The defendant agreed with another person to commit or assist in the commission of aggravated robbery.

"2. The defendant did so agree *with the intent* that aggravated robbery be committed.

"3. The defendant or any party to the agreement acted in furtherance of the agreement by discussing and planning the aggravated robbery, arrived at the location, and carried out the plan.

"4. This act occurred on or about the 9th day of January, 2013, in Wyandotte County, Kansas.

"The definition of Aggravated Robbery, the crime charged to be the subject of the conspiracy, is set forth in Instruction No. 18." (Emphasis added.)

"INSTRUCTION NO. 20

"The State must prove that the defendant committed the crime of Conspiracy to Commit Aggravated Robbery, *knowingly*.

"A defendant acts *knowingly* when the defendant is aware of the nature of his conduct that the State complains about." (Emphasis added.)

"INSTRUCTION NO. 21

"A person may be convicted of a conspiracy only if some act in furtherance of the agreement is proved to have been committed. An act in furtherance of the agreement is any act *knowingly* committed by a member of the conspiracy in an effort to effect or accomplish an object or purpose of the conspiracy. The act itself need not be criminal in nature. It must, however, be an act which follows and tends towards the accomplishment of the object of the conspiracy. The act may be committed by a conspirator alone and it is

20

not necessary that the other conspirator be present at the time the act is committed. Proof of only one act is sufficient." (Emphasis added.)

"INSTRUCTION NO. 25

"AS USED IN THESE INSTRUCTIONS, THE FOLLOWING WORDS AND PHRASES ARE DEFINED AS INDICATED:

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"A conspiracy is an agreement with another or other persons to commit a crime or to assist in committing a crime, followed by an act in furtherance of the agreement.

"The agreement may be established in any manner sufficient to show understanding. It may be oral or written, or inferred from all of the facts and circumstances."

Believing the jury should have been instructed that it had to find he committed the conspiracy to commit aggravated robbery "intentionally" rather than "knowingly," Butler contends the instruction was not legally appropriate because it impermissibly lowered the State's burden of proof. We exercise plenary review over such claims. See *Plummer*, 295 Kan. at 163.

A trial court has the duty to "define the offense charged in the jury instructions, either in the language of the statute or in appropriate and accurate language of the court" and "inform the jury of every essential element of the crime that is charged." *State v. Richardson*, 290 Kan. 176, 181, 224 P.3d 553 (2010). This duty arises from the right to public trial guaranteed by the state and federal constitutions. See *United States v. Gaudin*, 515 U.S. 506, 509-10, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995) (stating that the Fifth

21

and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); Kan. Const. Bill of Rights, §§ 5, 10 ("The right of trial by jury shall be inviolate.") ("In all prosecutions, the accused shall be allowed . . . to have . . . a speedy public trial by an impartial jury."). We examine jury instructions as a whole to determine whether they fairly state the applicable law or reasonably misled the jury. *Hilt*, 299 Kan. at 184-85.

At the outset, we note that Instruction No. 19 comports with PIK Crim. 4th 53.030 (2014 Supp.) and Instruction No. 25 matches PIK Crim. 4th 53.060 (2012 Supp.). Instruction No. 21 matches PIK Crim. 4th 53.040 (2012 Supp.)—which ascribes a knowing mental state to the commission of an act in furtherance of the conspiracy. "We strongly recommend the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015).

Aggravated robbery is defined as "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person" who "(1) [i]s armed with a dangerous weapon; or (2) inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2012 Supp. 21-5420(a)-(b).

Conspiracy is defined in relevant part as:

"(a) A conspiracy is an agreement with another person to commit a crime or to assist in committing a crime. No person may be convicted of a conspiracy unless an overt act in furtherance of such conspiracy is alleged and proved to have been committed by such person or by a co-conspirator.

"(b) It is immaterial to the criminal liability of a person charged with conspiracy that any other person with whom the defendant conspired lacked the actual intent to

22

commit the underlying crime provided that the defendant believed the other person did have the actual intent to commit the underlying crime." K.S.A. 2012 Supp. 21-5302.

The text of the conspiracy statute does not specify a mental state. What is more, mental states necessary to engage in a conspiracy are notoriously difficult to classify:

"Although the crime of conspiracy is 'predominantly mental in composition,' there has nonetheless always existed considerable confusion and uncertainty about precisely what mental state is required for this crime. . . . [T]his is undoubtedly attributable to two factors: (1) it is conceptually difficult to separate the mental state requirement from the agreement which constitutes the act; and (2) as with all inchoate crimes, it is necessary to take into account the elements of the crime which is the objective." 2 LaFave, Substantive Criminal Law, Acts and Mental State § 12.2(c) (3d ed. 2018).

LaFave divides the first element of conspiracy—an agreement between two or more persons to commit or assist in committing a crime—into (1) the intent to agree and (2) the intent to achieve a certain objective, which are often blurred together. LaFave, § 12.2(c)(1)-(2); see 15A C.J.S., Conspiracy § 122 ("There are two aspects of knowledge involved in a conspiracy:  knowing participation or membership in the scheme charged and some knowledge of the unlawful aims and objectives of the scheme."). Confusion may arise when "the objective of the conspiracy, if achieved, is itself a crime, for under such circumstances the mental state for that crime must also be taken into account" because "a 'conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself.'" LaFave, § 12.2(c)(2).

Butler argues that "intentionally" is the proper culpable state for conspiracy. To support his claim, he points us to a body of caselaw indicating conspiracy is a specific intent crime. This holding arose from our decision in *State v. Campbell*, 217 Kan. 756,

23

770, 539 P.2d 329 (1975). In that case, this court considered whether the conspiracy statute was unconstitutionally vague for failing to require an intent to commit the offense. 217 Kan. at 769. The conspiracy statute at issue in *Campbell* is substantively the same as the current one. Compare K.S.A. 21-3302 (Weeks) with K.S.A. 2012 Supp. 21-5302(a). In *Campbell*, we stated:

"As a general rule a specific intent is essential to the crime of conspiracy (16 Am. Jur. 2d, Conspiracy, § 9). The specific intent required divides into two elements: (a) The intent to agree, or conspire, and (b) the intent to commit the offense (Harno, 'Intent in Criminal Conspiracy' [1941], 89 U. Pa. L. Rev. 624, 631). Defendants concede that the act of conspiring being volitional includes within itself the intent to agree ('Developments in the Law—Criminal Conspiracy,' 72 Harv. L. Rev. 920, 935). They urge that the second intent necessary is not provided for in the present statute. In 1, Anderson, Wharton's Criminal Law and Procedure, § 85, it is stated:

'Analytically a dual mental state is present in the case of conspiracy. There is both (1) the intent or agreement of the parties to act together, and (2) the intent to commit an unlawful act or to commit a lawful act by unlawful means, or to do an act jointly which the law makes illegal when done by two or more persons. . . . Because of the obvious practical difficulty of proving the existence of the two distinct intents, the courts generally do not make any distinction between them. Because the intent to conspire is also a criminal act, there is also little distinction made between intent and act, except as reference is made to an overt act in addition to the formation of the conspiracy agreement.' (p. 183.)

"Defendants' basic proposition is that the conspiracy statute does not require an intent and one may unintentionally violate the statute's proscription and be found guilty.

"K.S.A. 21-3302 provides that a conspiracy is an agreement with another person to commit a crime or to assist to commit a crime. The essence is the agreement to commit a crime, not simply to commit a particular act, as to drive an automobile at a certain time

24

and place. Clearly a mental state is contemplated. An individual might agree to perform a certain act but it is difficult to conceive how one could unintentionally agree to commit a crime. K.S.A. 21-3201 provides that criminal intent is an essential element of every crime and may be established by proof that the conduct of the accused was willful. *Willful conduct is defined as knowing and intentional and not accidental*. Therefore, an individual could not be found to have unintentionally violated the statute. Full protection against this occurrence will be afforded at trial by instructions to the jury on the factual issue of intent. K.S.A. 21-3302 is not unconstitutionally vague and indefinite." (Emphasis added.) 217 Kan. at 770-71.

The *Campbell* court held conspiracy required intent but defined such intent in terms of K.S.A. 21-3302 (Weeks)—conduct that is willful, knowing, or intentional and not accidental. Prior to July 1, 2011, our criminal code equated "knowing" with "intentional." K.S.A. 21-3201. The culpability statute that *Campbell* relied upon provided:

"(1) Except as provided by sections 21-3202, 21-3204, and 21-3405, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was willful or wanton. Proof of willful conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a wanton manner.

"(2) Willful conduct is conduct that is purposeful and intentional and not accidental. As used in this code, the terms '*knowing*,' '*intentional*,' 'purposeful,' and 'on purpose' are included within the term 'willful.'" (Emphasis added.) K.S.A. 21-3201 (Weeks).

As part of the larger recodification of our criminal code in 2011, the Kansas Legislature largely adopted the Model Penal Code's definitions for culpable mental states. See *State v. Thach*, 305 Kan. 72, 83, 378 P.3d 522 (2016); American Law Institute,

Model Penal Code § 2.02(2) (1985); Kansas Criminal Code Recodification Commission, 2010 Final Report to the Kansas Legislature, Vol. 1, pp. 21-23 (December 16, 2009).

Unlike before, our criminal code now distinguishes between knowing and intentional conduct:

"(h) A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are specific intent crimes. A crime may provide that any other culpability requirement is a specific intent.

"(i) A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result. All crimes defined in this code in which the mental culpability requirement is expressed as 'knowingly,' 'known,' or 'with knowledge' are general intent crimes." K.S.A. 2012 Supp. 21-5202.

As can be seen by the evolution of our mens rea statutes, the phrases "general intent" and "specific intent" as used in K.S.A. 2012 Supp. 21-5202 do not mean what they once did in *Campbell* and in other cases where those terms were used with their common law definitions. See *State v. Hobbs*, 301 Kan. 203, 211, 340 P.3d 1179 (2015) ("[T]he legislature does not intend for 'general intent' to necessarily mean what it once did and that 'knowingly,' as used in [the aggravated battery statute] means that the accused acted when he or she was aware that his or her conduct was reasonably certain to cause the result."). Hence the caselaw description of conspiracy as a specific intent crime

26

has little relevance to the mental state legally required as an element of the crime. Given this, we turn instead to the most determinative factor for consideration—the language of the statute.

According to K.S.A. 2012 Supp. 21-5202(a), "Except as otherwise provided, a culpable mental state is an essential element of every crime defined by this code." When the statute is silent as to the mens rea required but does not plainly dispense with a mental element, a culpable mental state is still necessary. K.S.A. 2012 Supp. 21-5202(d). Subsection (e) provides in such situations, either "intent," "knowledge," or "recklessness" suffices to satisfy the culpable mental state. And while the conspiracy statute is silent on the applicable mens rea, the robbery statute provides that a defendant must "knowingly" take property from another. K.S.A. 2012 Supp. 21-5420(a); see *State v. Wilkins*, 267 Kan. 355, 364-65, 985 P.2d 690 (1999) (holding that "the overt act alleged for the crime of the conspiracy to commit murder was the murder itself, and the overt act alleged for the commission of aggravated robbery was the aggravated robbery itself"); 15A C.J.S. Conspiracy, § 126 ("The criminal intent necessary to establish conspiracy liability must be the same degree of criminal intent as is necessary for proof of the underlying substantive offense.").

Reading these statutes *in pari materia*, we conclude it was legally appropriate for the court to instruct the jury that it had to find Butler committed the conspiracy to commit aggravated robbery "knowingly." See *State v. Nguyen*, 304 Kan. 420, 425, 372 P.3d 1142 (2016); see also *State v. Heironimus*, 51 Kan. App. 2d 841, 850, 356 P.3d 427 (2015) (using K.S.A. 2011 Supp. 21-5202[e] to define the necessary culpable mental state for leaving the scene of an accident); *City of Hutchinson v. Bolinger*, No. 111,689, 2015 WL 3632324, at *3-4 (Kan. App. 2015) (unpublished opinion) (using K.S.A. 2014 Supp. 21-5202[e] to define the necessary culpable mental state for furnishing alcohol to a minor).

*The district court did not abuse its discretion by denying Butler's motion for new trial based on ineffective assistance of trial counsel.*

Butler next claims the district court erred when it denied his motion for new trial based on ineffective assistance of trial counsel. A district court may grant a new trial to a defendant "if required in the interest of justice." K.S.A. 2012 Supp. 22-3501(1). An appellate court reviews the district court's decision on a motion for new trial for an abuse of discretion. *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016). "'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *State v. Mattox*, 305 Kan. 1015, 1029-30, 390 P.3d 514 (2017).

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel applies to state proceedings via the Fourteenth Amendment to the United States Constitution. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). The Sixth Amendment guarantees more than the mere presence of counsel; it mandates "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984); see also *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting *Strickland*).

> "'The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption

28

that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]

"'[Under the second prong of the test for ineffective assistance of counsel], the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citations omitted.]'" *State v. Schaefer*, 305 Kan. 581, 596-97, 385 P.3d 918 (2016).

In Butler's case, the district court conducted an evidentiary hearing on the motion for new trial. Under these circumstances, we review the district court's underlying factual findings using a substantial competent evidence standard and review the legal conclusions based on those facts de novo. *State v. Johnson*, 304 Kan. 924, 950, 376 P.3d 70 (2016). "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015).

Before considering the merits of Butler's claim, we note the district court had jurisdiction—so we have jurisdiction—to consider Butler's claim that trial counsel provided ineffective assistance of counsel even though he filed his pro se motion for new trial beyond the 14-day limit in K.S.A. 2012 Supp. 22-3501(1). See *State v. Reed*, 302 Kan. 227, 236, 352 P.3d 530 (2015) ("[U]ntimeliness of a motion for new trial is a procedural flaw that may affect the defendant's right to counsel; but it does not deprive the district court or a later appellate court of jurisdiction."); see also *State v. Moody*, 272 Kan. 1199, 1202, 38 P.3d 659 (2002) (stating that if a district court lacked jurisdiction to enter an order, an appellate court cannot acquire jurisdiction over the subject matter on appeal).

Butler claims his trial attorney's performance was so deficient that he was denied a fair trial. "It is within the province of a lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions." *Thompson v. State*, 293 Kan. 704, 716, 270 P.3d 1089 (2011).

"'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *State v. Coones*, 301 Kan. 64, 74-75, 339 P.3d 375 (2014) (quoting *Strickland*, 466 U.S. at 690-91).

Yet, it is inappropriate to argue that counsel's alleged strategic decisions are insulated from review when counsel lacks the information necessary to make an informed decision due to an insufficient investigation. *Wilkins v. State*, 286 Kan. 971, 982, 190 P.3d 957 (2008). Butler bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. See *Sola-Morales v. State*, 300 Kan. 875, 888, 335 P.3d 1162 (2014).

Butler claims his trial counsel failed to:  (1) arrange for his girlfriend to provide an alibi defense at trial; (2) contact the pawn shop in Leavenworth to investigate a gun that may have been involved in the shooting; (3) subpoena Butler's phone records; and (4) pursue forensic evidence at the crime scene. We consider each claim in turn.

First, Butler claims his trial counsel failed to contact his girlfriend, Erin Davis, who would have provided him with an alibi defense at trial. On September 3, 2015—the day of the evidentiary hearing on the motion for new trial—Butler filed with the court a

notarized statement from Davis claiming Butler was with her on the night of the shooting. The document was notarized on August 13, 2015—nearly 10 months after Butler's trial. The statement did not indicate whether Davis had provided this information to Butler's trial counsel prior to trial. When Butler's new attorney confronted trial counsel during the evidentiary hearing with the affidavit, the following interaction took place:

"Q. . . . And if she's giving a statement at this point of where he was during the time—

"A. Um-hum

"Q. —would it have been a good idea to talk to her?

"A. She never mentioned this. This was filed in September?

"Q. This statement, no, no. This was just filed today.

"A. It was filed today?

"Q. Um-hum.

"A. Yeah. I mean . . . the answer to your question is she never brought this up. She never once contacted me saying that this is all wrong. He was with me at the time of the homicides, nothing like that. And there's nothing in the discovery to suggest that. This is news to me."

At other times during the hearing, trial counsel unequivocally stated Butler never provided him with an alibi prior to trial. The district court made a factual finding that Butler's girlfriend did not allege an alibi defense until after Butler was convicted. This fact differentiates Butler's case from the two cases on which he relies—*State v. James*, 31 Kan. App. 2d 548, 67 P.3d 857 (2003), and *State v. Sanford*, 24 Kan. App. 2d 518, 948 P.2d 1135 (1997). In both *James* and *Sanford*, trial counsel was made aware of potential

31

alibi evidence prior to trial, but neither attorney could properly explain after the fact why each did not pursue the alibi evidence.

Butler simply asks us to reweigh his trial counsel's credibility against Davis' and find Davis to be more believable. Appellate courts do not do such things. See *State v. Davis*, 306 Kan. 400, 408-09, 394 P.3d 817 (2017) ("'Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'"). There is substantial evidence to uphold the court's decision.

Butler also contends his trial counsel neglected to investigate a gun that was at one time located in a Leavenworth pawn shop. Butler evidently believes this gun was used by the true shooter. This topic was also discussed during the evidentiary hearing:

"Q. There was also a . . . question about a gun and a pawn shop, do you recall that?

"A. Yes.

"Q. Okay. And you were provided with all the discovery in this case, is that correct?

"A. Yes, sir.

"Q. And one of those was a statement by a man named Kris Dean, is that right?

"A. Yes, sir.

"Q. Kris Dean was never called as a witness either from the State or from you?

"A. No.

"Q. Okay. Why did you not look into that or do you recall anything about that?

"A. Well, it was irrelevant again. If I recall, Kris Dean said that he had a firearm, that it was pawned by his fiancee and that they then got it out of pawn and that he kept it in his car. So I didn't see any relevance that a gun being at a pawn shop has anything to do with anything, but that he kept it in his car and that somebody must have taken it out of his car.

"Q. And, at some point in time, that got stolen?

"A. That's my understanding. That's what . . . he said he did report that . . . theft.

"Q. Was there ever any indication throughout the evidence or your review of that evidence to show that gun or Mr. Dean was involved in the homicide?

"A. No, not at all.

"Q. Now, did Mr. Butler ever tell you anything about Mr. Dean being the one who performed the homicide?

"A. No. Marcus said he had no—he claimed he had no idea who did the homicide."

Butler's brief cursorily argues that trial counsel's decision to not investigate was unreasonable under the circumstances. But the extent of his argument is trial counsel acted unreasonably simply because he was aware of this gun. Otherwise, he fails to support his claim. See *State v. Bowen*, 299 Kan. 339, Syl. ¶ 10, 323 P.3d 853 (2014) ("When a litigant fails to adequately brief an issue it is deemed abandoned."). Nonetheless, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Coones*, 301 Kan. at 74. There is substantial evidence to support the district court's finding that this line of investigation was irrelevant to Butler's defense.

Lastly, Butler argues his trial counsel acted unreasonably by not subpoenaing his phone records and not pursuing forensic evidence at Yanos' apartment.

Regarding the phone records, trial counsel stated:

"A. . . . I will admit that we talked about the phone records, absolutely. What exactly their usefulness would be, I'm not sure. I don't know if Marcus believed that they would show that—I'm not sure what he—I guess he can testify to that. But it wasn't something that was going to greatly influence the case one way or another or really influence the case at all at least from what he was telling me.

"Q. And what kind of phone records was he looking for? Phone calls, text messages, those sort of things?

"A. I don't recall. Probably both, but I don't recall specifically what he was looking for.

"Q. But at no point in time did he ever tell you what those phone records would show or how it would help his case?

"A. He never said anything like get the phone records and you will see that I was not present during the time of the homicide or something like that. He never said anything like that."

Trial counsel provided similar reasoning for not pursuing DNA evidence:

"Q. One of the other issues that came up was the DNA and the forensic evidence that Mr. Butler was asking you to research?

"A. Um-hum.

"Q. I believe you said that for your recollection, the only DNA taken from the scene was from the vehicles of the victims, is that correct?

34

"A. That's my recollection.

"Q. In fact, there was no DNA taken from the scene?

"A. Not that I recall.

"Q. There was never any indication through the evidence that the person who committed these crimes, the defendant, was harmed or left any DNA?

"A. That was my understanding.

"Q. No blood, no injuries, anything of that nature?

"A. No. And . . . quite frankly, that was our defense. I know during the entire trial, we were harping on that that Marcus wasn't there and you couldn't prove it, that there was no forensic evidence whatsoever. And so not only did . . . I believe that the DNA that was taken had nothing to do with Marcus, meaning there was no evidence whatsoever whoever perpetrated these crimes touched those cars, but, number two, I'm not really sure we would want DNA tested anyway because, at best, it's gonna show that Marcus's DNA's not on there. But, again, there's no allegation that whoever did the shooting touched those cars. At worst, it would come back with his DNA on it. So we weren't gonna do your job for you.

"Q. And, in fact, that was . . . [a] big part of your closing argument was that there was no forensic evidence available that tied the defendant to this crime, is that correct?

"A. Yes, sir."

The district court ultimately believed Butler's phone records were irrelevant. It also thought it was reasonable for his attorney not to pursue forensic evidence for fear that the defense might unwittingly place Butler at Yanos' apartment. Indeed, there was ample evidence at trial Butler had previously purchased marijuana from Yanos. Jewell

35

testified he and Butler would occasionally go together to Yanos' apartment to purchase marijuana. Thus the district court's reasoning is sound.

In a similar fashion, it would make sense for trial counsel to not subpoena Butler's phone records when there was no indication it would support Butler's defense. There was evidence presented at trial that Butler spoke with Jewell over the phone multiple times about robbing Yanos on the day of the robbery. Uncovering evidence corroborating the State's theory certainly would not have been in Butler's best interests.

On appeal, Butler neglects to explain how this type of evidence would have advanced his defense. We conclude there was substantial evidence to support the district court's findings.

As such, the district court did not abuse its discretion in denying Butler's motion for new trial based on ineffective assistance of counsel.

*The district court erred by not giving a limiting instruction regarding certain K.S.A. 60-455 evidence, but the error does not constitute clear error.*

Butler next contends the district court erred by failing to give a limiting instruction regarding three categories of evidence: (1) Butler's prior purchases of marijuana from Yanos; (2) Butler's threats toward Cole and Barger; and (3) Butler's alleged requests of Cole and Barger to help him rob Yanos. Butler concedes, however, he did not request a limiting instruction at trial, nor did he object to the testimony he now claims prejudiced the jury against him. We recently explained the process of review by an appellate court in such situations:

> "[R]eview of this issue is controlled by K.S.A. 22-3414(3) and the stair-step analytical process set out in *State v. Herbel*, 296 Kan. 1101, Syl. ¶¶ 7, 8, 299 P.3d 292 (2013), and

36

*State v. Williams*, 295 Kan. 506, 511, 286 P.3d 195 (2012); see also *State v. Breeden*, 297 Kan. 567, 582, 304 P.3d 660 (2013) (failure to object to the admission of K.S.A. 60-455[b] evidence does not waive the right to raise on appeal the issue of whether the failure to give a limiting instruction was clearly erroneous).

"As *Williams* articulated, K.S.A. 22-3414(3) creates a procedural hurdle when a party does not object to the failure to give an instruction because the statute establishes a preservation rule for instruction claims on appeal. It provides, in part, that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included offense instruction, unless the giving or failure to give the instruction is clearly erroneous. If it is clearly erroneous, appellate review is not predicated upon an objection in the district court. 295 Kan. at 512-13.

"To establish that the giving or failure to give an instruction was clearly erroneous, the reviewing court must determine whether there was any error at all. This requires demonstrating that giving the proposed instruction would have been both legally and factually appropriate, employing an unlimited review of the entire record. *Williams*, 295 Kan. at 515-16. And if error is found on that basis, then the court moves to a reversibility inquiry in which it assesses whether it is firmly convinced the jury would have reached a different verdict had the instruction been given. The defendant maintains the burden to establish the degree of prejudice necessary for reversal. 295 Kan. at 516." *State v. Burnett*, 300 Kan. 419, 445, 329 P.3d 1169 (2014).

Prior to trial, Butler filed a motion in limine, seeking to exclude, *inter alia*, "[a]ny prior or uncharged bad acts unrelated to the crime." During the hearing on the motion, Butler's counsel argued this same evidence was more prejudicial than probative. The State believed this evidence should be admitted because it proved Butler's intent while committing the crimes. The court agreed the evidence went to Butler's intent, determined the evidence was more probative than prejudicial, and found no constitutional violations. But the court neglected to give a limiting instruction at trial.

K.S.A. 2012 Supp. 60-455 provides in relevant part:

"(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.

"(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

We have previously explained the analytical steps court are to take when admitting K.S.A. 60-455 evidence:

"[T]he court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in." *State v. Reid*, 286 Kan. 494, 503, 186 P.3d 713 (2008).

On appeal, Butler does not challenge the admissibility of this evidence. Rather, he argues because the district court did not provide the jury with a limiting instruction explaining the specific purpose for which the evidence was admitted, the jury could have used the evidence to conclude he had the propensity to commit the alleged crimes or crime in general. The purpose of a limiting instruction is to "'eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime.'" *Reid*, 286 Kan. at 503 (quoting *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 [2006]); see *State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 (1973) (listing three types of prejudice that might result from the use of other crimes evidence).

38

The initial step of our analysis, however, is whether there was any error at all. See *Burnett*, 300 Kan. at 445. To do this, we must question whether this evidence qualifies as K.S.A. 60-455 evidence, which would trigger the need for a limiting instruction. If so, we conduct a clear error analysis to determine whether reversal is necessary. *Gunby*, 282 Kan. at 58 ("[A] trial judge should give such a K.S.A. 60-455 limiting instruction, but the failure to do so, though error, will no longer demand automatic reversal. Where the complaining party neither requested the instruction nor objected to its omission, the failure to give the instruction will be reversible only if clearly erroneous."). "This requires us to make a de novo determination of whether we are firmly convinced the jury would have reached a different verdict had a limiting instruction been given." *State v. Breeden*, 297 Kan. 567, 584, 304 P.3d 660 (2013).

Butler takes issue with evidence of his alleged attempts to recruit Barger and Cole. During direct examination, the State asked Cole: "[P]rior to the date of January 9th, had [Butler] asked you a couple times about helping him?" Cole responded: "Yeah, and I just told him no, you're not gonna do that, those are my friends." He later stated during cross-examination that Butler asked him to help rob Yanos four or five times prior to January 9, 2013. Barger testified Butler told him he was upset with a purchase and Butler was either going to get his money back or do something about it. Barger confirmed that Butler "approached [him] about Nick Yanos."

Cole also stated Butler threatened him on two occasions: (1) as Butler and Jewell were fleeing from the apartment and (2) again two days later while Cole was at work. Barger testified Butler threatened him the day after the shooting while at work.

"K.S.A. 60-455 does not apply if the evidence relates to crimes or civil wrongs committed as a part of the events surrounding the crimes for which [the defendant] was on trial—that is, the res gestae of the crime." *State v. King*, 297 Kan. 955, 964, 305 P.3d

39

641 (2013); see *State v. Peppers*, 294 Kan. 377, 389, 276 P.3d 148 (2012) ("Our decision in *Gunby* eliminated res gestae as an *independent basis* for the admission of evidence. It did not eliminate the admission of evidence of events surrounding a commission of the crime under the applicable rules of evidence."). "'Res gestae refers to acts that occurred "'before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form, in reality, a part of the occurrence.'"'" *State v. McDaniel*, 306 Kan. 595, 616, 395 P.3d 429 (2017).

Butler alleges that these events—which amount to preparations immediately prior to the crime itself and efforts immediately after the crime to avoid detection—fell within the ambit of K.S.A. 2012 Supp. 60-455. We disagree. Rather, they were clearly part of the res gestae, so intertwined with the botched robbery that they are part of the robbery itself. See *State v. Charles*, 304 Kan. 158, 175-76, 372 P.3d 1109 (2016) (defendant's comments toward a store employee before he made a criminal threat toward another store employee was not evidence that occurred on another occasion), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 1006, 399 P.3d 211 (2017), *petition for cert. filed* December 29, 2017; *King*, 297 Kan. at 963-64 (holding defendant's threat toward a witness before setting victim's house on fire was not K.S.A. 60-455 evidence); see also *Pennsylvania v. Carroll*, No. 1930 EDA 2016, 2017 WL 5451753, at *5 (Pa. Super. 2017) (unpublished opinion) ("[T]he threat of retribution would be a part of the history of the case which completes the story and forms part of the natural development of the facts, from robbery to police report, to threat of retribution, to retribution, under the res gestae exception."). Thus we hold that K.S.A. 2012 Supp. 60-455 was not implicated by this evidence.

Lastly, Butler argues reversal is warranted because the court did not give a limiting instruction regarding his prior marijuana purchases from Yanos. At trial, Cole testified he had referred Butler to Yanos. Barger told the jury he knew Butler purchased marijuana from Yanos. Jewell testified Yanos was Butler's drug dealer, Butler bought

marijuana from Yanos on a weekly basis, and Butler wanted to rob Yanos because Yanos had previously sold him "shake weed" instead of "solid nuggets."

Admitting evidence of Butler's drug purchases without an instruction to the jury that it could only consider this as evidence of Butler's motive to rob Yanos was error. See *State v. Magallanez*, 290 Kan. 906, 919, 235 P.3d 460 (2010) (finding error where the district court gave a "shotgun" limiting instruction for evidence of defendant's prior marijuana sales along with other K.S.A. 60-455 evidence).

Yet, the court's failure was not clear error. Butler's use of marijuana was apparent throughout the trial. Jewell testified Butler approached him and asked if he would help him rob Yanos of "his weed and his money." Cole told the jury Butler wanted to know how much marijuana Yanos kept on him at a time. Nearly every witness who interacted with Yanos did so because Yanos sold them marijuana. In sum, we are not firmly convinced the jury would have reached a different result had a limiting instruction been given. See *State v. Carapezza*, 286 Kan. 992, 1001, 191 P.3d 256 (2008) (concluding the court's failure to give a limiting instruction regarding defendant's prior drug use was not clear error where defendant's drug use was "obvious and referenced throughout the trial").

*The prosecutor did not commit error during closing arguments.*

Butler next contends the prosecutor committed reversible error by referring to his theory of the case as "ridiculous" in the rebuttal portion of closing arguments. After this appeal was docketed but before the briefs were filed, we articulated a new standard for prosecutorial error claims in *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). Both Butler and the State briefed the issue using only the *Sherman* rubric. Generally, an opinion changing the law acts prospectively, applying "'to all cases, state or federal, pending on direct review or not yet final.'" *State v. Mitchell*, 297 Kan. 118, 124-25, 298

P.3d 349 (2013) (quoting *State v. Berry*, 292 Kan. 493, 514, 254 P.3d 1276 [2011]). Thus we apply only the *Sherman* framework.

*Sherman* directs appellate courts to use a two-step process to evaluate claims of prosecutorial error—simply described as error and prejudice. To determine if the prosecutor erred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109. If the court finds error, the burden falls on the State to demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. 88, Syl. ¶ 8.

Butler's theory of the case, which he advanced during closing arguments, was that Meyn, Eberth, Schierbaum, Barger, Cole, and Pruneda—as they knew each other from high school—gave false testimony to protect each other. Aside from pointing to inconsistencies in the witnesses' testimony, Butler's trial counsel attacked the State's theory of the case:

> "Second point, ladies and gentlemen, is that the fact that this story that's being offered to you is simply ridiculous. Why would Marcus approach the friends of Nick Yanos to rob Nick Yanos? That would be like me recruiting Mr. Richman [a prosecutor] to rob Mr. Boyd [the other prosecutor]. It makes no sense. If you believe Marcus Butler did do this, why would he then go give a full confession to friends of Nick Yanos, to friends of Matt Gibson, to friends of Leland Pruneda to the acts in full detail? It makes no sense. It makes no sense because it didn't happen."

The State responded to this argument in rebuttal:

"Ladies and gentlemen, you just heard a lot from the defense attorney. I think one of his key words there was ridiculous. Why would Marcus Butler go and ask people that knew people that he was going to rob? Well, it worked for him, didn't it? Worked for him when he asked Tyler Jewell. So Tyler Jewell knew Nick Yanos, he told you he didn't like him, he had an attitude and kind of seemed like a punk dealing drugs. He agreed.

"Kyle Cole didn't agree with him, told him no, don't do that. Beau Barger also, neither of them took him serious. So why would he ask? Is that ridiculous? He was looking for somebody to go help him rob. He was angry about the person shorting him from drugs, he was complaining about that to the people who set him up with that person to buy drugs.

. . . .

"Now, when you also look through that, look through their testimony, look through everybody's testimony, and when you do that, the defense's argument is basically this was a conspiracy by people who had known each other for a long time to set up one person: Ridiculous. The defense used the word 'ridiculous'. Is that ridiculous? What in any way, shape or form do you have that 7 to 10 people decided to set up this one person? Nobody testified they had a problem with him. Tyler said they were friends, Beau and Kyle both said they never had problems with him prior to any of this happening. Half the other people in the apartment didn't even know who he was. Where is this 7 to 10 person conspiracy to point out one man, a man that some don't know, a man the rest don't have a problem with? Ladies and gentlemen, ridiculous."

Although Butler's counsel did not object to the comments, "we will review a prosecutor's comments made during voir dire, opening statement, or closing argument on the basis of prosecutorial error even without a timely objection, 'although the presence or absence of an objection may figure into our analysis of the alleged misconduct.'" *State v.*

43

*Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017) (quoting *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]).

Butler only takes issue with the prosecutor's use of the word "ridiculous" to characterize his theory of the case. "The first step in this review—whether the actions of the prosecutor were outside the wide latitude afforded prosecutors—is sound and is left undisturbed by our decision today." *Sherman*, 305 Kan. at 104; see *State v. Banks*, 306 Kan. 854, 862, 397 P.3d 1195 (2017) ("The determination of the first prong . . . is left unchanged by *Sherman*[.]"); *State v. Kleypas*, 305 Kan. 224, 314, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017). "*Sherman* has drawn a distinction between prosecutorial conduct that is merely negligent or careless and prosecutorial conduct that is intentional or in some way malicious." *State v. Carter*, 305 Kan. 139, 148, 380 P.3d 189 (2016); see *Sherman*, 305 Kan. at 93 (explaining that the new approach would benefit every concerned party, including the "State's fine and ethical prosecutorial corps who need no longer fear that their every mistake will be tinged with the hint of unethical behavior").

Butler believes the prosecutor's comments improperly disparaged his theory of the case as well as imparted the prosecutor's personal opinion to the jury. He also believes that such a comment constitutes an "end-run to bolstering the credibility of the witness testimony which supported the prosecution[.]" "In general, a prosecutor may not offer a jury the prosecutor's personal opinion as to the credibility of a witness because such a comment is unsworn, unchecked testimony, not commentary on the evidence of the case. The determination of the truthfulness of a witness is for the jury." *State v. Akins*, 298 Kan. 592, Syl. ¶ 6, 315 P.3d 868 (2014). "[F]air comment on trial tactics and the interpretation of evidence is allowed, so long as care is taken not to 'inappropriately denigrate opposing counsel or inject personal evaluations of the honesty of witnesses.'"

*State v. Crum*, 286 Kan. 145, 150, 184 P.3d 222 (2008) (quoting *State v. Mosley*, 25 Kan. App. 2d 519, 525, 965 P.2d 848 [1998]). Prosecutors have some latitude to use colorful language when arguing the State's case. *State v. Maestas*, 298 Kan. 765, 777, 316 P.3d 724 (2014).

Butler claims "[i]t has long been a rule of law that referring to the defendant's story as ridiculous, absurd, or ludicrous is improper and outside the wide latitude allowed the prosecution during closing argument. *See State v. Douglas*, 274 Kan. 96, 108, 49 P.3d 446 (2002)." We disagree that *Douglas* established a "rule of law" that a prosecutor's use of any of these words automatically constitutes error. Courts do not isolate the challenged comments; they consider them in the context they were made. *Davis*, 306 Kan. at 413.

In *Douglas*, the prosecutor made several objectionable remarks during closing arguments:

"'[I]f you believe every word that came out of Mr. Douglas' mouth, then you're pretty naive, because what he said doesn't make any sense. . . .

"'. . . So, without me spending any more time on his story, which is quite frankly unbelievable . . . . It's the State's position that you should not believe anything he says.'

. . . .

"'Defendant's story is unbelievable. It is absolutely, totally and completely unbelievable. . . .'

. . . .

"'[I]t is up to you to decide the weight and credit to give any particular witness or any piece of testimony, so you can judge what Mr. Douglas has decided to tell you and

45

judge it for what it is worth. And I will call it what it is. It's unbelievable. It is unbelievable. . . .'

. . . .

"'. . . I submit to you that you shouldn't believe a word out of his mouth.'" 274 Kan. at 106-07.

Applying our old framework for analyzing prosecutorial misconduct claims, the court concluded the prosecutor's remarks did not rise to the level of the conduct warranting reversal. *Douglas*, 274 Kan. at 107-08.

The prosecutor in *Douglas* also referred to the defendant's version of the events as "ridiculous and absurd and ludicrous," and the district court instructed the jury to disregard the statement. 274 Kan. at 108. This court succinctly concluded: "While such a comment *appears* improper, it did not deprive Douglas of a fair trial." (Emphasis added.) 274 Kan. at 108.

In *Douglas*' wake, the Court of Appeals has struggled with similar statements. See *State v. Gleason*, No. 111,311, 2015 WL 7434220, at *5-6 (Kan. App. 2015) (unpublished opinion) (holding that prosecutor's statement that defendant's theory of the case was "ludicrous and simply not supported by any of the evidence or testimony" was nonprejudicial error), *rev. denied* 305 Kan. 1254 (2016); *State v. Norwood*, No. 109,419, 2014 WL 6909514, at *11-12 (Kan. App. 2014) (unpublished opinion) ("[t]he phrase '[i]t's ridiculous' is an impermissible personal opinion from the prosecutor on the credibility of this testimony."), *rev. denied* 302 Kan. 1018 (2015); but see *State v. Jefferson*, No. 97,991, 2008 WL 2051743, at *2 (Kan. App. 2008) (unpublished opinion) (concluding that prosecutor's statement that the defendant's explanation for his confession was ridiculous was a fair characterization of the evidence).

46

Recently, our Court of Appeals questioned the breadth of *Douglas*' holding in *State v. White*, 53 Kan. App. 2d 44, 384 P.3d 13 (2016), *rev. denied* 306 Kan. 1331 (2017). In *White*, the prosecutor twice referred to defendant's theory of defense as "ridiculous," and White relied on *Douglas* to argue the statements were outside the wide latitude allowed to prosecutors. The panel stated, "Given the *Douglas* court went directly to the issue of prejudicial conduct, without deciding the issue, we will assume for the purposes of this opinion the use of the word ridiculous is outside the wide latitude allowed prosecutors during closing argument." 53 Kan. App. 2d at 50. Nonetheless, the court was troubled by our lack of discussion in *Douglas*, wondering whether "the prosecutor's remarks, standing alone, would have been reversible error had the jury not been instructed to disregard it" and what effect the additional words "absurd and ludicrous" had on the ultimate outcome. 53 Kan. App. 2d at 50. The court nonetheless held there was no reasonable possibility the error contributed to the verdict. 53 Kan. App. 2d at 52.

This brings us to the ultimate question of whether the prosecutor's use of ridiculous in this case was a fair comment. Webster's Third New International Dictionary (unabridged) 1953 (1971) defines "ridiculous" as: "1:  fit or likely to excite ridicule; unworthy of serious consideration . . . 2:  violating decency or moral sense." It strikes us as reasonable to assume the prosecutor was not implying Butler's theory of the case violated decency or moral sense nor was the prosecutor inviting the jury to ridicule Butler. The most reasonable assumption is the prosecutor was simply arguing Butler's version of the events was unworthy of serious consideration, i.e., it was not believable.

The manner in which Butler's trial counsel used the same word in closing arguments bolsters our interpretation. Defense counsel posited the State's theory of the case was "simply ridiculous" because "[i]t makes no sense. It makes no sense because it didn't happen." In other words, defense counsel was imploring the jury to consider the testimony given at trial and find it not believable. Likewise, we conclude the prosecutor

was trying to make the same fair comment on the evidence. See *State v. Matuszak*, 263 Mich. App. 42, 55-56, 687 N.W.2d 342 (2004) ("While the prosecution's assertion that the defense argument was ridiculous may have been characterized differently, a prosecutor need not state arguments in the blandest possible terms."); *State v. Mohamed*, No. A12-0069, 2012 WL 6734447, at *4 (Minn. Ct. App. 2012) (unpublished opinion) ("[The prosecutor] implied only that Mohamed's defense was ridiculous, even laughable, based on the facts. Her comments were blunt, but not misconduct."); see also *State v. Kelly*, 106 Conn. App. 414, 431 n.11, 942 A.2d 440 (2008) (stating that the prosecution's claim during closing arguments that the defendant's theory of events was "preposterous" was a permissible appeal to the jury's common sense in evaluating the weaknesses in defendant's case).

We recently stated it was error for a prosecutor to characterize the defendant's theory of the events as "preposterous." *State v. Sprague*, 303 Kan. 418, 427, 362 P.3d 828 (2015). Nonetheless, *Sprague* provides no guidance here because the State conceded error in that case. See 303 Kan. at 428; but see *State v. Fisher*, 304 Kan. 242, 265, 373 P.3d 781 (2016) (Rosen, J., concurring) (contending that a prosecutor's use of the expression "bull" in the context of the case was synonymous with using "ridiculous," which was within the wide latitude allowed to a prosecutor when discussing the evidence). We also note that using the word "ridiculous" in this context does not rise to the level of claiming Butler was a liar. See *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 (2005) (the prosecutors use of terms such as "yarn," "fairy tale," "fabrication," "tall tale," and "spin" were thinly veiled ways of calling the defendant a liar).

In sum, we hold the use of ridiculous in this context is a fair comment on the believability of Butler's theory of defense. As such, we do not reach the question of prejudice.

*Cumulative error did not deprive Butler of a fair trial.*

The final trial issue for us to consider is whether cumulative error deprived Butler of a fair trial. The only trial error we discern is the district court's failure to give a limiting instruction for the K.S.A. 60-455 evidence admitted at trial. "[I]f there is no error or only a single error, cumulative error does not supply a basis for reversal." *State v. Love*, 305 Kan. 716, 737, 387 P.3d 820 (2017). Butler is not entitled to reversal based on cumulative error.

*The sentencing court erred when it imposed lifetime postrelease supervision rather than lifetime parole.*

Lastly, the parties agree that the court erred by sentencing Butler to lifetime postrelease supervision as opposed to lifetime parole. To answer this question, we must interpret various sentencing statutes, which is a question of law subject to unlimited review. *State v. Louis*, 305 Kan. 453, 466, 384 P.3d 1 (2016).

After sentencing Butler to life imprisonment, the court imposed lifetime "postrelease supervision." The journal entry of judgment reflects the same. An individual convicted of felony murder is subject to a mandatory sentence of life imprisonment. K.S.A. 2012 Supp. 21-6806(c). Another statute provides that "an inmate sentenced to imprisonment for an off-grid offense committed on or after July 1, 1999, shall be eligible for *parole* after serving 20 years of confinement without deduction of any good time credits." (Emphasis added.) K.S.A. 2012 Supp. 22-3717(b)(2); see *State v. Ballard*, 289 Kan. 1000, 1014, 218 P.3d 432 (2009) (explaining the general differences between parole and postrelease supervision). Thus the district court should have imposed lifetime parole.

The appropriate remedy is for us to vacate this portion of Butler's sentence and remand to the district court to impose lifetime parole. See *State v. Potts*, 304 Kan. 687, 709, 374 P.3d 639 (2016) (vacating defendant's sentence where the district court erroneously noted in the journal entry that defendant was subject to lifetime postrelease supervision rather than lifetime parole for a felony-murder conviction). We therefore vacate this portion of Butler's sentence and remand to the district court for resentencing.

In conclusion, we affirm Butler's convictions but vacate the lifetime postrelease portion of his sentence and remand to the district court so it may sentence Butler to lifetime parole.