NOT DESIGNATED FOR PUBLICATION

No. 119,990

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SCHINA T. GANTT,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DAVID J. KAUFMAN, judge. Opinion filed October 11, 2019. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., LEBEN, J., and BURGESS, S.J.

PER CURIAM: Schina Tyrone Gantt appeals the district court's dismissal of his K.S.A. 2018 Supp. 60-1507 habeas corpus motion after a full evidentiary hearing. On appeal, Gantt contends that his trial counsel was ineffective. Specifically, Gantt argues that he would have accepted a plea bargain if he had listened to the 911 call prior to trial. Based on our review of the record on appeal, we conclude that the district court's findings of fact were supported by substantial evidence. Likewise, we conclude that Gantt has failed to establish either prong of the *Strickland* standard. Thus, we affirm the district court's decision.

1

FACTS

On August 6, 2013, the State charged Gantt with aggravated robbery and attempted murder in the first degree. After the parties were unable to successfully negotiate a plea agreement, the case proceeded to a jury trial. Following a four-day trial, a jury convicted Gantt on both counts. A panel of this court affirmed Gantt's convictions on August 14, 2015. *State v. Gantt*, No. 111,601, 2015 WL 5009868 (Kan. App. 2015) (unpublished opinion). On March 28, 2016, the Kansas Supreme Court denied Gantt's Petition for Review.

In his direct appeal, the panel summarized the underlying facts as follows:

"On July 31, 2013, at about 11:05 p.m., Officer Stephen Schmitt of the Wichita Police Department was dispatched to a call at a residence on North Piatt in Wichita. When Schmitt and other officers arrived at the scene, they went up to the house and tried to open the door but it was locked. Schmitt heard a person inside calling for someone to kick in the door. Another officer kicked in the door, and the officers entered the house. Schmitt noticed a black male, who was later identified as Maurice Kelly, lying on the floor and holding a white t-shirt or rag over his neck covered in blood. Schmitt called for EMS. The officers secured the residence but they did not locate a suspect or any other individuals inside the house.

"After the house was secure, Schmitt returned to where Kelly was lying on the floor. Another officer asked Kelly who had attacked him, and Kelly replied, 'Shorty.' At the hospital, Schmitt talked to Kelly to try to determine who Shorty was and what happened that led to Kelly's injuries. Kelly told Schmitt that Shorty cut him with some knives from Kelly's kitchen while Shorty was getting a drink of water. Kelly also identified a person named Chill as coming to the house with Shorty. While Schmitt was questioning Kelly, he was in a lot of pain, but he was cooperative.

"While at the hospital, Kelly was interviewed by Detective Patrick Phipps. Kelly told Phipps that he was stabbed in his home by someone named Tyrone or Shorty. Kelly

2

could not provide the full name of the person who attacked him. After the interview, Phipps ascertained that the real name of Tyrone or Shorty might be Gantt. Kelly obtained a photograph of Gantt and put it into a 'six-pack lineup.' On August 2, 2013, Phipps took this lineup to the hospital to show Kelly. Kelly identified the photograph of Gantt as the person who stabbed him.

"At trial, Kelly provided the following account of how he was attacked. According to Kelly, Gantt came to his house around 10 or 11 on the morning of July 31, 2013. When he came over, Kelly's next door neighbor, Six, was with Gantt. Kelly's friend, Chill, also was with Gantt. Gantt, Six, and Chill were at Kelly's house to buy cocaine. Kelly sold Gantt cocaine, and Gantt and Kelly smoked the cocaine. After Gantt smoked his first rock of cocaine, he bought another. Each rock was two-tenths of a gram and cost $20.

"After Gantt bought the second rock, he told Kelly that he had to go cut a lawn. Six and Chill stayed at Kelly's house while Gantt went to cut the lawn. Gantt was only gone for about 15 minutes. When Gantt returned, he bought more cocaine and smoked it with Kelly. After smoking the cocaine, Gantt left to cut another lawn. While Gantt was gone, Six and Chill left Kelly's house.

"Gantt returned to Kelly's house again and smoked more cocaine. After smoking the cocaine, Gantt was talking with Kelly about how he had to work for the rest of the day. Gantt wanted a drink of water, and Kelly told him to go ahead and get one. While Gantt went into the kitchen to get water, Kelly was facing the front door with his back to the kitchen. After Kelly heard the faucet turn on, the next thing he remembered was his throat being cut. Kelly initially could not see who was behind him with the knife, but Gantt was the only other person in the house. After his throat was cut, Kelly fell to the floor on his back. Gantt was holding several knives, which Kelly recognized as belonging in his kitchen. Gantt began stabbing Kelly in the chest with the knives.

"While Kelly was lying on the floor, he tried to fight off Gantt. During the fight, Gantt pulled off Kelly's right sock. This was where Kelly kept the drugs he was using and selling. When Gantt pulled the sock off, the cocaine, which was in a sandwich bag, went flying through the bathroom door. Gantt went to where the cocaine fell, picked it up, and

3

put it in his pocket. After he got the bag of cocaine, Gantt picked up a knife he lost in the initial struggle with Kelly and said, 'Now I gotta kill you, nigger.' Kelly and Gantt scuffled, and Kelly was able to use his feet to prevent Gantt from getting close to him. During the scuffle, Kelly told Gantt, 'Hey . . . [y]ou ain't gotta do this. I'll give you this shit.' Gantt then walked back to the door that was just off the kitchen, opened it, made sure the door was locked, closed the door, and left. Gantt did not say anything as he left.

"After Gantt left, Kelly called 911. Kelly tried to stop the bleeding by putting his hand over his chest and pressing on it. Kelly thought he might die depending on how fast help arrived. Kelly told the dispatcher that he was 'bleeding out,' but he threw his phone away from him so he would not have to answer the dispatcher's questions. After a while, Kelly heard the police beating on his door.

"As part of the crime scene investigation, Carla Patton of the Wichita Police Department attempted to lift fingerprints off the chairs in Kelly's home, but she was unable to lift any prints from the chairs. The glass tabletop also was not conducive to fingerprints because it was covered in blood. She also could not retrieve fingerprints from the front door or the back door. Patton swabbed some blood for potential DNA testing. However, Phipps elected to forego DNA testing as part of his investigation of the case.

"Phipps interviewed Gantt after Kelly identified Gantt's photograph as his attacker. Phipps provided Gantt with *Miranda* warnings and asked him about the day of the attack. Gantt admitted that he was at Kelly's house that day at multiple times, but he denied being involved in any attack on Kelly. During the interview, Gantt acknowledged that some people call him by his nickname of Shorty.

"On August 6, 2013, the State charged Gantt with one count of aggravated robbery and one count of attempted first-degree murder. The jury trial began on January 27, 2014. Schmitt, Patton, Phipps, and Kelly testified for the State. Kelly identified Gantt as the individual who slashed his throat and stabbed him. On cross-examination, Gantt's attorney challenged Kelly's credibility by pointing to his intoxication on the day of the attack, his discrepancy on the time of the attack, his identification of the attacker as Shorty, his prior convictions for crimes of dishonesty, his incentive to testify in exchange for immunity, and his negative attitude toward law enforcement.

4

"Gantt called his older brother, Norman Gantt, as a witness. Norman testified that he saw Gantt walking down the street on July 31, 2013, around 5:30 p.m., and there did not appear to be anything wrong with him. Norman indicated that Gantt often slept in Norman's Jeep Cherokee. Norman testified that on August 1, 2013, he searched the back of the Jeep because he had heard 'rumors' that Gantt had cut somebody or had been in a fight. Norman testified that he did not see any blood or knives in the back of the Jeep. Charlotte Gantt, Gantt's sister-in-law, testified that she sometimes calls Gantt by the name of Tyrone but she has never heard anyone call him Shorty. Charlotte testified that she saw Gantt walking down the street on July 31, 2013, between 6 p.m. and 6:15 p.m., and everything seemed to be normal.

"During the jury instruction conference, Gantt informed the district court that he wanted to pursue an all or nothing defense, and he objected to an instruction on the lesser offense of attempted second-degree murder. The district court noted the objection but found that the court was required to give the instruction nonetheless. The parties never discussed a lesser offense instruction on attempted voluntary manslaughter.

"On January 30, 2014, the jury found Gantt guilty as charged of one count of aggravated robbery and one count of attempted first-degree murder. On April 1, 2014, the district court sentenced Gantt to 272 months' imprisonment for attempted first-degree murder and 59 months' imprisonment for aggravated robbery. The district court ordered the sentences to run concurrently. Gantt timely appealed the district court's judgment." 2015 WL 5009868, at *1-3.

On June 22, 2016, Gantt filed a K.S.A. 60-1507 motion, which is the subject of this appeal. Although Gantt asserted several issues in his motion, the one that is relevant to this appeal involves the failure of trial counsel to play a recording for him prior to trial of a 911 call made by the victim—Maurice Kelly—shortly after he was stabbed. The district court summarily denied Gantt's K.S.A. 60-1507 motion initially. However, it subsequently granted a motion to reconsider and set the matter for an evidentiary hearing.

A review of the 911 recording—which was admitted into evidence at trial and is included in the record on appeal—reveals that Kelly told the dispatcher that a person named "Shorty" or "Tyrone" had stabbed him. Kelly also told the dispatcher that the attacker was black. In addition, he told the dispatcher that he was "bleeding to death" and provided his address. A little more than a minute after the 911 call began, Kelly told the dispatcher that he was "passing out" and he remained silent—other than intermittent heavy breathing—until emergency responders arrived at his house.

On May 22, 2017, the same district judge who had presided over Gantt's trial also presided over the evidentiary hearing on the K.S.A. 60-1507 motion. At the hearing, Gantt's trial counsel—Chrystal Krier—testified regarding her defense strategy and various other topics. Regarding the recording of the 911 call made by Kelly, she acknowledged that she had not played the 911 recording to Gantt prior to trial. However, Krier testified that she had only received the recording shortly before trial and that she did not believe it was necessary to actually play it for Gantt prior to trial.

Krier explained that she had pointed out to Gantt that "the words that were used in that 911 call" were "in the officer's report, so he knew what that 911 call contained." Krier also testified that she gave Gantt copies of all of the written discovery she had received from the State before the commencement of trial. The written discovery included the officer's report setting out the contents of the 911 recording.

In addition, Krier testified regarding an oral plea offer made by the State "just before trial." She indicated that the State made an oral offer to dismiss the other charges against Gantt if he would agree to plea to a severity level 4 aggravated battery. According to Krier, she informed Gantt of the offer and told him he was "looking at going to prison for 68 to 75 months" and could be out "in less than five" years if he pled to aggravated battery. By comparison, Krier explained to Gantt that if he was found guilty of the counts

6

charged by the State that he could be sentenced to "285 [months], plus 60 months" if the sentences ran consecutive.

Krier testified that after she told him about the plea offer, Gantt told her that he "didn't do it" and was "not pleading to anything." Krier also testified that she gave Gantt her evaluation of the strengths and weaknesses of the State's case. In addition, Krier testified that Gantt did not request another offer because he "was convinced he was going to trial." She described Gantt as being "very adamant about his innocence and not taking a deal."

In his testimony, Gantt agreed that Krier met with him approximately 14 times before trial. He admitted on cross-examination that during these meetings, Krier discussed witnesses and other aspects of the case. He indicated that Krier never played for him the recording of the 911 call the victim made seeking assistance after he was stabbed. Gantt testified that Krier told him at trial that she had just received the tape and "hadn't really had a chance to listen to it herself." Gantt agreed that Krier did not receive the tape until January 23, one day prior to trial.

Gantt also acknowledged that the contents of the 911 call were in the police report, which Krier had given to him. Nevertheless, he asserted his belief that the recording was the "true evidence" and, had he heard it prior to trial, he would have accepted the plea offer. He explained that he "would have been a fool to go to trial knowing that [the State] had this 911 tape that says that I [did] it." He further testified that a tape is "different from someone just saying that you done it." Gantt agreed that the main difference between what was written in the police report and what was in the audio recording of the 911 call was that Kelly could be heard "gasping for air. . . ."

7

Gantt testified that Krier had advised him of the plea offer and that he had asked her, "why would I want to take a plea when I ain't committed no crime?" Gantt alleged that Krier told him that the State had no evidence against him and that because of this reassurance, he was surprised at trial when the State actually played the recording of the 911 phone call. Following the evidentiary hearing, Gantt and the State filed written closing arguments.

On April 24, 2018, the district court denied Gantt's K.S.A. 60-1507 motion from the bench. In doing so, the district court made these findings concerning the recording of the 911 call:

"Allegation number 3 is Ms. Krier's failure to notify [Gantt] of the 911 tape until the day of trial. Factual findings are Ms. Krier received the 911 tape either on January 22nd or January 23rd of 2014; in other words, a Wednesday or Thursday before the Monday trial, which I believe was January 27, 2014. The late receipt of the 911 tape—or—or recording was not a surprise to Ms. Krier or Mr. Gantt because it had been referenced in the paper discovery provided by the State to the defense. The police reports stated the content of the 911 call, specifically that the victim called Mr. Gantt 'Shorty,' and [Gantt] previously acknowledged in contact with law enforcement that people called him 'Shorty.' Also, police reports reference the 911 call saying the victim states 'Shorty' . . . 'Tyrone,' did the crime . . . attack. Moreover, Ms. Krier also reviewed the transcript of the 911 call and discussed it with Mr. Gantt before trial."

The district court then found that Gantt "failed to establish by a preponderance of the evidence standard that Ms. Krier's representation fell below an objective standard of reasonableness considering all of the circumstances."

ANALYSIS

On appeal, Gantt raises a single issue. He contends that the trial counsel's failure to play the recording of the 911 recording for him prior to trial constituted ineffective

8

assistance of counsel. Gantt requests that we vacate his sentence and remand this matter to the district court with instructions that the State reinstate the offer to plead to aggravated battery. In response, the State argues that Gantt failed to carry his burden of proof at the evidentiary hearing before the district court and that the K.S.A. 60-1507 motion was properly denied.

When a district court conducts an evidentiary hearing on claims of ineffective assistance of counsel, we review its factual findings using a substantial competent evidence standard. Next, we review the district court's legal conclusions based on those facts under a de novo standard. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018). To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 [1984]).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. We must presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, a defendant must show a reasonable probability that—but for counsel's deficient performance—the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Gantt argues that he would have accepted the State's plea offer had his trial counsel played the recording of the victim's 911 call for him prior to trial. In support of his argument, Gantt cites two cases from other jurisdictions. First, he cites *United States*

9

*v. Day*, 969 F.2d 39, 44 (3d Cir. 1992), in which the Third Circuit Court of Appeals remanded a habeas corpus action to the district court for an evidentiary hearing after finding that "if [the defendant] is correct that he was seriously misled about his sentence exposure when the likelihood of his conviction was overwhelming, he received ineffective assistance of counsel." Second, he cites *Holmes v. State*, 277 S.W.3d 424, 427 (Tex. App. 2009), in which the Texas Court of Appeals ordered a new trial after finding that "counsel admittedly failed to investigate and discover evidence, failed to develop a trial strategy, failed to be prepared for trial, and failed to object or seek a continuance." Thus, we do not find either case to be particularly helpful to our analysis in this case.

Here, there is substantial evidence in the record to support the district court's findings of fact. In particular, there is evidence establishing (1) that Gantt was adamant that he was innocent and wanted to go to trial; (2) that the police reports included the contents of the 911 call; (3) that these reports were included in written discovery; (4) that Gantt's attorney provided him with the written discovery including the contents of the 911 call; and (5) that the attorney received a copy of the 911 recording only shortly before trial. Gantt explained that the only difference between the contents of the police report and the recorded tape is that the listener can "hear someone gasping for air on audio." As such, based on the totality of the evidence, Krier's representation was not objectively unreasonable under the first *Strickland* prong.

Even if Krier's failure to play the 911 recording to Gantt prior to trial was objectively unreasonable, we do not find that he was prejudiced under the circumstances presented. Although Gantt now asserts that he would have accepted the State's plea offer had he heard the 911 recording before trial, this position is inconsistent with the evidence in the record of his unwillingness to consider any plea. In particular, Krier testified:

- "[H]e was upset [be]cause he wanted to go to trial."
- "He said, I didn't do it. I didn't—I'm not pleading to anything."

- "I discussed the facts with him that he came in and said this, and he's like, He's lying. I didn't do it. I want to fight this. His position maintained the same."
- "[H]e was very adamant about his innocence and not taking a deal."
- "[H]e'd change the subject and say, No, I—I want to go to trial. He's lying. I didn't do this. I'm not gonna plead guilty to something I didn't do."
- "He was pretty adamant about going to trial."
- "[H]e was adamant that he didn't do it."

Similarly, while Gantt takes the position that he would have accepted the plea offer if he had heard the tape before going to trial, he continued to deny his guilt at the evidentiary hearing. Specifically, he testified:

- "Well, why would I want to take a plea when I ain't committed no crime?"
- "I didn't never hurt the victim."
- "I felt that it was my time to get up and—and—and tell—tell the truth, that I didn't commit the crime."
- "I told her that I didn't commit the crime. That's all I told her. I didn't commit a crime."
- "I told her I was guilty of no crime, so that's her decision whether [to go to trial]."

As such, Gantt did not establish at the evidentiary hearing that he would have accepted the State's plea offer even if he had heard the 911 recording. Gantt admits that he knew the words spoken in the recording from the written discovery provided to him prior to trial, and it should have come as no surprise that there may be heavy breathing sounds coming from someone who had been stabbed in the neck. Ultimately, the record reveals that Gantt wanted to go to trial and only asserted that he would have accepted the plea offer after his convictions were affirmed. Thus, we find that Gantt has not met the second *Strickland* prong because he has failed to show that there was a reasonable probability of a different result absent the alleged deficient performance by his trial counsel.

11

We, therefore, conclude that the district court's denial of his K.S.A. 60-1507 motion should be affirmed.

Affirmed.