NOT DESIGNATED FOR PUBLICATION

No. 122,643

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANTHONY RUCKER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; BILL KLAPPER, judge. Opinion filed October 1, 2021. Reversed and remanded with directions.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before WARNER, P.J., MALONE and BUSER, JJ.

PER CURIAM: Anthony Rucker appeals the district court's denial of his K.S.A. 60-1507 motion alleging ineffective assistance of trial counsel. Rucker was convicted following a jury trial of criminal threat, criminal discharge of a firearm at an occupied building, and aggravated assault. For the reasons we will carefully explain in this opinion, we find the district court erred in denying Rucker any relief on his ineffective assistance of counsel claim. Thus, we reverse the district court's judgment and remand with directions to grant Rucker a new trial.

1

FACTUAL AND PROCEDURAL BACKGROUND

The facts and previous procedural history of this case were summarized in *Rucker v. State*, No. 118,112, 2018 WL 3485666, at *1-4 (Kan. App. 2018) (unpublished opinion):

"'Bradley Willis owned a rental property located at 4511 Rowland Avenue in Kansas City, Kansas, which he rented to members of Rucker's family for approximately 2 1/2 years. During the Rucker family's tenancy, Willis became familiar with Rucker because, as landlord, he went to the property at least once a month to collect the rent and/or to perform repairs and Rucker was present during several of these visits.

'In approximately December 2010, Marsha Rucker, Rucker's mother, notified Willis that the family planned to vacate the property and would need a couple of weeks to move their belongings. Marsha updated Willis as to the status of the move-out on several occasions. On January 6, 2011, she called Willis to confirm that they had officially vacated the property. Consequently, later that day, Willis went to the rental house with his brother, Jake Willis, and Jake's best friend, Zachary Langston, to do any cleaning or repairs that were necessary to put the property back on the rental market. They began cleaning the house, and while they were doing so, they left the front door and garage door open.

'Willis testified that after approximately 30 minutes, while he was working in the garage, Rucker arrived at the property in "an '86, '87 green [Chevy] pickup, long bed, single cab," driven by "another guy." Rucker told Willis that he was "going to need [to grab] some things," and Willis told him that he could take whatever he wanted because he had planned to throw away the items the Rucker family left behind. According to Willis, Rucker then looked around in the garage and went through the living room and kitchen area. But after "kind of just pac[ing] through the house and never grabb[ing] anything," Rucker "started getting kind of mad" for no apparent reason. When asked at trial what Rucker was talking about when he became agitated, Willis stated, "Just wanting things, and I told him he could have things and he was just kind of mumbling on about—just like pissed off in a way. . . . I really don't know why he was mad, to tell you the truth." Due to Rucker's erratic behavior, Willis asked him to step outside because his little brother was there and Rucker was "cursing a lot."

2

'Once outside, Rucker and Willis continued to exchange words. Rucker led Willis to believe that he wanted a "wheel or something" that was in the trash truck. When Willis told him he could have it, Rucker's anger only escalated and he started screaming obscenities at Willis. Rucker told Willis that he was "going to come back and Glock up the place or glack up the place," a statement which Willis understood to mean that Rucker planned to come back to the house and shoot them. Willis could not think of any reason for Rucker all of a sudden to get excited and make such a threat because he had already told Rucker he could take whatever items he wanted from the property. Consequently, Willis took Rucker's threat seriously and he immediately telephoned 911. Willis described Rucker's demeanor during this call, "Just felt threatened in a way, so I just called just to—just to get a cop there just in case." Rucker left the scene.

'Jake was cleaning inside the house and heard his brother and Rucker engaging in a heated conversation both inside and then outside the house. He stated, "I heard just more cussing and some yelling, and then I heard [Rucker state,] 'I'm going to come back and gat this place up,' and the exact words of my brother, '[D]o what you got to do, I'm going to call the cops.'" Jake interpreted the phrase "gat this place up" to mean "[c]ome back and shoot the place, shoot whoever's there," and he believed the word "gat" was slang for "Gatlin."

'Langston was also cleaning inside the house and heard an argument between Willis and an individual whose appearance was "very similar" to that of Rucker. He later heard the individual state, "'I'm going to gack the place up'" and, in response, Willis threatened to call the police. Similar to Willis and Jake, Langston understood the phrase "gack the place up" to mean that the individual planned to "come back and shoot the place up."

'After Rucker left the scene, Willis started cleaning the front yard. Approximately 5 minutes later, Willis saw a car turn down the street. As it slowly approached the house, Willis heard gunshots coming from the vehicle. Willis looked up at the car and noticed that it was a "small [or midsized] compact car, four door" and darker in color. According to Willis, a black male was driving the car and Rucker was seated in the middle of the backseat and had some sort of pistol in his hands. Willis considered Rucker to be easily identifiable because he was "about six foot, 3 hundred some pounds."

'According to Willis, Rucker kept the gun inside the car and fired it through the backseat window, which was rolled halfway down. Jake and Langston were cleaning the front bedroom when Rucker fired the gun at the residence. Jake heard "loud bangs"

3

coming from the street and he realized the bangs were gunfire when he saw a sheet covering one of the windows move and Langston fall to the ground with a bullet wound. After Langston "bounced once and then got back up," Jake carried him into the far back bedroom, where the two of them took cover on the floor until the shooting ceased. According to Jake, Langston looked terrified, he could not move at all, he was groaning very loudly, and he could not put a sentence together, i.e., he could only "put out a couple words at a time."

'Willis testified that after Rucker fired a couple times at the house, Rucker noticed that he was in the front yard. Rucker pointed the gun directly at Willis and began shooting in his direction. Willis ran towards the garage and dove inside. When the car left the scene, Willis screamed for Jake and Langston, and upon discovering that a bullet had hit Langston, Willis called 911 for the second time that day. Unlike his first call to 911, Willis described his demeanor as "pretty frantic" because he "couldn't believe that Rucker came back and shot over pretty much nothing."

'According to Dr. Charlie Richart, M.D., an attending physician in trauma and surgical critical care at the KU Medical Center, Langston arrived at the hospital by ambulance in critical condition. The bullet had entered Langston's right chest and exited through his back. When the trauma team opened Langston's chest, they discovered his liver was in his chest because the bullet had destroyed his diaphragm, the muscle that separates the abdomen from the chest and allows one to breathe. Langston also had two lacerations on his right lung that were actively bleeding, two ribs were "pretty well destroyed" by the bullet, and the arteries that run with the ribs were also bleeding. Langston remained hospitalized for approximately 2 weeks. He testified he has lasting effects from his injuries including shrapnel in his right chest, a hard time breathing, and difficulty sleeping due to nightmares.

'Brian Christian, a detective with the Kansas City, Kansas Police Department, interviewed Rucker on November 2, 2011. After advising Rucker of his *Miranda* rights, he asked Rucker if he was familiar with the residence located at 4511 Rowland. Rucker replied he was because some of his family members lived there and, although he did not personally live there, he used that address to receive his food stamp assistance from the State of Kansas. Rucker acknowledged he had gone to the residence on January 6, 2011. Detective Christian testified that Rucker provided the following description of the events that transpired while he was there:

4

'"[Rucker] advised that he had got a ride from a friend, and he couldn't remember his name. They arrived in a green pickup truck. He got out of the truck and stood on the side of the truck and had some words with the landlord, Bradley Willis. He advised that he did not leave the side of the truck and that he couldn't remember what the words that were exchanged between him and Bradley Willis at the time, so once he figured his people weren't there he got back in the vehicle and left the area."

'When asked if, based upon his training, knowledge, and experience, he knew what the word "Glock" referred to, Detective Christian replied that this term referred to a weapon, specifically, a handgun. Detective Christian further explained he interpreted the word "gat" as slang for the word "shoot."

'At his jury trial, Rucker waived his right to testify and called one witness to testify on his behalf, Etoyce Fantroy. Fantroy testified that on January 6, 2011, he lived at his parents' residence located at 4517 Rowland Avenue, the residence neighboring Willis' rental property, and although he did not know Rucker personally, he had seen him next door. Fantroy testified that on January 6, he saw Rucker and another individual "basically getting into a[n] argument next door." According to Fantroy, shortly after Rucker left the scene, a "rustic-type gold vehicle" pulled in front of the house and a gunman, perched in the backseat of the vehicle, fired several rounds at the house.

'Fantroy maintained he got a good look at the shooter and it was not Rucker. Fantroy testified the perpetrator was a guy a little bit bigger than him with light skin and long, shoulder-length hair. During his cross-examination, Fantroy admitted he was on probation for aggravated battery and possession of phencyclidine and other minor violations. He further acknowledged that law enforcement had spoken with him at his residence twice following the shooting.

'The State subsequently called Detective James Gunzenhauser, of the Kansas City, Kansas Police Department, who interviewed Fantroy following the shooting. He testified he advised Fantroy of the shooting at his neighbor's residence and asked him if he knew anything about the crime. The only thing Fantroy could tell him was that his neighbor was a "large black male that he knew as Rucker." Fantroy did not tell Detective Gunzenhauser that he had seen the shooting, nor did he mention anything about a gold-colored car or a rifle. Moreover, even though Fantroy spoke with Detective Gunzenhauser about Rucker, he never mentioned that Rucker did not do the shooting.

'Following deliberations, the jury found Rucker guilty of one count each of criminal threat, a severity level 9 person felony; criminal discharge of a firearm at an

occupied building, a severity level 3 person felony; and aggravated assault, a severity level 7 person felony. Because the State had moved for an upward departure sentence, the district court subsequently asked the jury to determine whether the evidence supported the State's four proposed aggravating factors. After deliberations, the jury found evidence to support three of them.

'The district court denied Rucker's posttrial motions for new trial and/or a judgment of acquittal, and the case proceeded to sentencing. Based upon the aggravating factors approved by the jury, particularly the senseless and random nature of Rucker's crimes, the court imposed an upward durational departure sentence of 118 months' incarceration followed by 36 months' postrelease supervision for discharging a firearm into an occupied building. The court imposed standard sentences for the other two convictions and ordered they be served concurrent with the 118 month sentence for the discharging of a weapon crime.' [quoting *State v. Rucker*, No. 109,678,] 2014 WL 4231234, at *1-4 [(Kan. App. 2014) (unpublished opinion)].

"In his direct appeal, Rucker argued: (1) that the district court erred by denying his out-of-time request to file a notice of alibi witnesses, (2) that the district court erred by excluding evidence of previous shootings at the scene of the crime, and (3) that substantial competent evidence did not support the district court's upward departure sentence. This court rejected all three arguments and affirmed the district court's judgment. 2014 WL 4231234, at *13. The Kansas Supreme Court denied Rucker's petition for review on July 24, 2015. 302 Kan. 1019.

"On April 1, 2016, Rucker filed a motion for relief pursuant to K.S.A. 60-1507. In his motion, he asserted that his trial counsel, Charles Ball, provided ineffective assistance of counsel for three reasons: (1) Ball failed to file a notice of alibi in a timely manner, (2) Ball did not challenge the State's cross-examination of Rucker's only witness, and (3) Ball did not attack the aggravating factors, or offer mitigating factors, used by the district court to enhance his sentence.

"The district court summarily denied Rucker's petition in a memorandum decision on June 6, 2017. In that decision, the district court noted that Rucker failed to maintain contact with his attorney before trial, and the court found this action led to Ball's failure to file an alibi notice in time. The district court also rejected Rucker's assertions that Ball deficiently represented him during the trial or during sentencing. Rucker timely appealed."

6

This court found the district court erred in summarily denying Rucker's K.S.A. 60-1507 motion and remanded for an evidentiary hearing. On the alibi issue, the court stated:

"Clearly a fact issue is presented on whether Rucker provided Ball with sufficient information to timely file an alibi notice. Rucker's assertions, taken as true, establish that his attorney failed under the first prong of the *Strickland* test. Rucker's entire defense was that someone else was the shooter. An alibi defense is key to that argument. Rucker alleges that Ball knew the names of alibi witnesses and the nature of their testimony well before the October 22, 2012 deadline to file a timely notice. Furthermore, the record and motion imply that Ball failed to investigate the alibi witnesses at all, despite having the names and information about the alibi for months.

"To be entitled to relief, Rucker must show that there is a reasonable probability the jury would have reached a different result absent the deficient performance. Here, the State had only one witness, Willis, who identified Rucker as the shooter. Rucker produced a witness at trial, Fantroy, who testified that he was at the scene of the crime and Rucker was not the shooter. Apparently, the jury found Willis to be a more credible witness than Fantroy. Yet it is reasonably probable that the outcome of the trial would have been different had Rucker been allowed to call up to seven alibi witnesses in his defense. [Citation omitted.]" 2018 WL 3485666, at *6.

As for the sentencing issue, the court explained:

"The district court erred in finding that Rucker's claim on this issue had already been decided by the appellate courts. Although this court found in Rucker's direct appeal that at least one aggravating factor had been supported by substantial evidence, this court did not address Rucker's claim that his counsel was ineffective in failing to attack the aggravating factors. We also disagree that Rucker's claim on this issue is conclusory in nature. The record indicates that Ball presented no evidence to attack the aggravating factors used by the district court to enhance his sentence. Moreover, Ball made only a brief argument that the aggravating factors were insufficient to enhance his sentence. It appears that Ball made little effort to defend against the State's departure motion, which would constitute deficient performance absent evidence that Ball's performance was part of a strategic decision. Given that the departure sentence was double the presumptive

7

sentence for the primary crime, Rucker has shown potential prejudice on this claim."
2018 WL 3485666, at *7.

*Evidentiary hearing on Rucker's K.S.A. 60-1507 motion*

Because of the passage of time from Rucker's convictions, the judge who presided over the evidentiary hearing on the K.S.A. 60-1507 motion was not the same judge who presided over Rucker's trial. At the evidentiary hearing on the K.S.A. 60-1507 motion, Rucker called various family members as witnesses to support his claim. He did not call Ball. Miasha Rucker, Rucker's sister, testified that she and her father went to Ball's office in the summer of 2012 and gave Ball Rucker's alibi, her address, and her telephone number along with that of her mother, father, other brother, sister, and Anthony Dyer. Miasha stated that she told Ball that she was with Rucker at the time of the shooting.

Dyer, a friend of the family, testified that he was helping Rucker's family move on the day of the shooting and that he drove Rucker to Willis' house in his green pickup truck. Dyer said Rucker had "a few words" with Willis because he believed Willis was stealing property from the house that belonged to Rucker's family. Dyer testified that Rucker never made any threats towards Willis and Rucker never left the truck during the entire exchange. Dyer stated that he and Rucker left the house in his pickup truck after the encounter with Willis. Dyer testified that Rucker could not have returned 5 minutes later to shoot up the house, as Willis testified at trial, because Rucker was riding in the truck with him at that time. Dyer said he had one or two phone conversations with Ball about testifying at Rucker's trial, but he never heard back from Ball again.

Anthony Harlin, Rucker's father who seemed somewhat confused at the hearing, testified that he and his daughter told Ball at his office about Rucker's alibi before trial. Harlin testified that he told Ball Rucker was at home at the time in question. Harlin did not know when he gave Ball this information, but he stated he thought it was sometime

8

when it was cold. Harlin admitted that he was not comfortable with his ability to remember things at the evidentiary hearing.

Anisha Rucker, Rucker's little sister, stated she remembered the day of the shooting because the family was moving that day. She testified that Rucker could not have done the shooting because he was "there with us" when they received a phone call from Willis that the house had been shot up. She claimed that Rucker was at the family's new house putting things together with "me and mom and the kids." Anisha testified that she told Ball this information, but she could not remember when exactly she told him.

Rucker stated that he talked to Ball many times, and he met with him every other week at his office. Rucker testified that Ball knew his defense was an alibi defense because Rucker, his two sisters, and his father all met with Ball about the alibi and gave him their names and their home address, since they all lived together. Rucker also gave Ball Dyer's name and phone number. Rucker testified that this occurred during the summer before the first trial setting. Rucker said Ball could have contacted him at any time because Rucker went to the office to pay Ball before trial and Ball had his phone number. Rucker reiterated that he had "no doubt at all in [his] mind" that Ball knew about his alibi witnesses because Rucker, his sisters, and his father all talked about it with Ball. Rucker testified that his inability to call any alibi witnesses caused him not to testify because he thought it would be confusing if he claimed he was with his family and Dyer, but he could not call them to corroborate his claim.

The district court took the matter under advisement and later filed a memorandum decision denying Rucker's motion on all claims. The memorandum was not separated into findings of fact and conclusions of law, but the district court discounted Harlin's testimony "because of obvious physical and perceived mental acuity issues making his testimony suspect at best." As for the claim that Ball was ineffective for failing to timely file the alibi notice, the district court found that Rucker could not show deficient

9

performance without calling Ball as a witness to explain what information he needed to file the notice. The district court also found that Rucker failed to show prejudice because the alibi witnesses were "inconsistent" about where Rucker was at the time of the shooting. The district court surmised from the trial transcript that Willis' identification of Rucker as the shooter was solid. Ultimately, the district court found that Rucker "has not met his burden of showing the outcome [of the trial] would have been different to a reasonable degree of probability." Rucker timely appealed the district court's judgment.

DID THE DISTRICT COURT ERR IN DENYING RUCKER'S K.S.A. 60-1507 MOTION?

This court remanded Rucker's case for an evidentiary hearing on three claims. But on appeal, Rucker only challenges the district court's denial of two claims: whether Ball was ineffective for (1) failing to file a timely notice of alibi and (2) failing to challenge the aggravating factors used to enhance Rucker's sentence. Thus, Rucker has waived any challenge to the district court's denial of the third issue: whether Ball was ineffective for failing to challenge the State's cross-examination of Fantroy. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (stating an issue not briefed is waived or abandoned).

A district court has three options when handling a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *White v. State*, 308 Kan. 491, 504, 421 P.3d 718 (2018).

10

When the district court holds an evidentiary hearing, this court applies a two-step review process. First, this court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Second, this court conducts de novo review of the district court's ultimate conclusions of law. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

The Sixth Amendment to the United States Constitution, as applied to the states under the Fourteenth Amendment, guarantees that in criminal prosecutions the accused has the right to effective assistance of counsel. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). An ineffective assistance of counsel claim based on deficient performance is subject to the *Strickland* test. 300 Kan. at 882 (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]). The *Strickland* test requires Rucker to show that (1) the performance of trial counsel was deficient and (2) the deficient performance prejudiced him, "*i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance." *Sola-Morales*, 300 Kan. at 882 (citing *Strickland*, 466 U.S. at 687). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018).

*Was Ball ineffective for failing to timely file a notice of alibi?*

The district court found that Rucker did not meet his burden of showing that Ball was ineffective for failing to file a timely notice of alibi. The district court disregarded the testimony of Harlin because of his physical and mental issues making his testimony "suspect at best." The district court found that Rucker's witnesses all consistently claimed they provided Ball with the required alibi information. Despite this finding, the district court then pointed out that Ball once claimed he did not have the required information to file the notice, and thus the district court believed Rucker did not meet his burden of

11

showing that Ball did have the information because he did not call Ball as a witness at the hearing. The district court also found that Rucker failed to establish prejudice because Rucker's witnesses gave inconsistent alibis: his family claimed he was at home with them while Dyer claimed Rucker was with him in his truck.

Rucker argues that the district court erred in its legal conclusions. First, Rucker claims the district court disregarded the law of the case in finding that Rucker's claim failed on the prejudice prong. Rucker claims that the prior panel, in remanding his case for an evidentiary hearing, found that Rucker had established the prejudice prong of his claim. Second, Rucker argues that he established Ball acted deficiently because his sole defense was an alibi defense and his witnesses established that Ball timely had the required information to file the notice.

The State counters that Rucker failed to meet his burden of showing that Ball rendered deficient performance because he was not called as a witness to explain his trial strategy. The State argues that the district court correctly denied his motion because Dyer and Rucker's family's testimony was inconsistent. The State argues that Rucker failed to establish prejudice because the evidence if presented at trial would have been so weak, contradictory, and susceptible to impeachment that the district court correctly determined that it could not undermine confidence in the verdict.

Addressing Rucker's law of the case argument first, he is incorrect in asserting the prior panel concluded that he fulfilled the prejudice prong. The law of the case doctrine is a common-law rule that states "'[w]hen a second appeal is brought to this court in the same case, the first decision is the settled law of the case *on all questions involved in the first appeal*, and reconsideration will not normally be given to such questions.'" (Emphasis added.) *State v. Cheeks*, 313 Kan. 60, 66, 482 P.3d 1129 (2021). In the first appeal, the question was whether the district court properly summarily denied his motion because the motion, files, and case records *conclusively* showed that Rucker was entitled

12

to no relief on this claim. Under the summary dismissal standard, the panel merely determined that if Rucker's assertions were taken as true, then it could not be conclusively said that he was entitled to no relief.

The question addressed by the prior panel differed from the question before the district court at the evidentiary hearing. On remand, the district court needed to determine whether Rucker could prove, by presenting evidence, that his allegations were true. Thus, the law of the case doctrine did not preclude the district court from making findings of fact and conclusions of law on both the deficient performance and prejudice prongs based on the evidence presented at the evidentiary hearing. In fact, that is exactly what the mandate instructed the district court to do. The law of the case doctrine would only preclude the district court from again finding that the motion alone conclusively showed Rucker was entitled to no relief.

*Did Rucker establish deficient performance without Ball's testimony?*

Turning to the merits of Rucker's claim, a defendant proposing to offer alibi evidence must file a notice at least seven days before trial. K.S.A. 22-3218(1) and (2). "The notice shall state where defendant contends he was at the time of the crime, and shall have endorsed thereon the names of witnesses he proposes to use in support of such contention." K.S.A. 22-3218(1).

Rucker's decision not to call Ball is unusual given that the prior panel remanded the matter for an evidentiary hearing on claims of ineffective assistance of counsel. Generally, there is a strong presumption that trial counsel's conduct was reasonable. *Butler*, 307 Kan. at 853. And strategic decisions, made after thorough investigation, are virtually unchallengeable. 307 Kan. at 854. But trial counsel cannot claim a decision was strategic when trial counsel lacks the information necessary to make an informed decision. 307 Kan. at 854. Thus, determining what information trial counsel had and

13

whether trial counsel made strategic decisions is often crucial to determining the reasonableness of trial counsel's actions.

That said, at times it is clear from the record and circumstances that trial counsel's actions were not strategic even without testimony from trial counsel. Because Rucker did not call Ball as a witness at the evidentiary hearing, the only explanation in the record for why Ball did not timely file the alibi notice comes from the October 23, 2012, pretrial hearing. There, Ball admitted that he had the list of the names of Rucker's alibi witnesses before the deadline to file the notice but claimed the information was "incomplete . . . to comply with the statute." Ball did not elaborate on the information he needed to file the notice promptly, and the district court did not ask about the matter.

Rucker's witnesses at the evidentiary hearing corroborated that Ball at least had the names of Rucker's two sisters, his mother, his father, his brother, and Dyer in the summer of 2012, well before the October 22, 2012 deadline to file a timely alibi notice. The only information Ball needed to file the notice of alibi was the names of the witnesses, which Ball himself admitted he had, and where Rucker was at the time of the crime. See K.S.A. 22-3218(1). Thus, even if the district court believed Ball's explanation at the pretrial hearing that he only had the names of the alibi witnesses but not their testimony, Ball acted deficiently because he had a duty to contact and investigate the witnesses provided. See, e.g., *State v. Sanford*, 24 Kan. App. 2d 518, 522-23, 948 P.2d 1135 (1997) (finding trial counsel's performance deficient when defendant told trial counsel of several people he was with at the time of the crime, but trial counsel only made a "perfunctory attempt" to contact them or further investigate the claims).

This court has found that a trial counsel's failure to file a notice of alibi was deficient performance under similar circumstances. In *State v. Thomas*, 26 Kan. App. 2d 728, 993 P.2d 1249 (1999), trial counsel moved to present alibi witnesses after the close of the State's evidence even though he had not filed a notice of alibi. Trial counsel

14

claimed that because the witnesses had been endorsed by the State, he did not believe a notice needed to be filed. The district court did not allow Thomas to call any alibi witnesses because counsel failed to file the notice. After the trial, Thomas hired new counsel who filed a motion for new trial based on ineffective assistance of counsel for failing to file a notice of alibi. Thomas did not call the trial counsel to testify at the hearing, but Thomas called his mother, who testified that she told the trial counsel about Thomas' alibi nine months before trial. The district court denied the motion for new trial. On appeal, this court found trial counsel's performance was deficient for failing to file the notice of alibi because Thomas' sole defense was an alibi and counsel had a duty to investigate and contact Thomas' alibi witnesses. See 26 Kan. App. 2d at 731-32.

Similarly, here, even if Ball only had the names of Rucker's alibi witnesses before the deadline to file the notice of alibi, it was unreasonable for him not to contact the witnesses himself if he felt that he needed more information to file the notice. The evidence showed that Ball had several months to investigate the witnesses' testimony. And Rucker presented evidence that Ball had all the statutorily required information to file the notice in the summer of 2012 even without additional investigation. Ball's failure to timely file the notice of alibi witnesses or at least investigate their testimony could not have been a strategic decision. As a result, Rucker sufficiently established his claim that Ball's performance was deficient.

*Did Rucker show he was prejudiced by Ball's deficient performance?*

To prevail on his ineffective assistance of counsel claim, Rucker also needed to show there was a reasonable probability that the jury would have reached a different result absent Ball's failure to timely file the alibi notice. See *Butler*, 307 Kan. at 853. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. 307 Kan. at 853. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. 307 Kan. at 853.

15

The district court found that Rucker failed to show prejudice because the alibi witnesses presented inconsistent alibis—he was either with Dyer in the truck or at the new house with his family—and the district court concluded the inconsistent alibis would not have outweighed Willis' identification of Rucker as the shooter. But a review of the testimony at the hearing shows that the testimony of Rucker's alibi witnesses was not inconsistent—at least not in any material way. When their testimony is considered together, Miasha, Harlin, and Anisha testified that the family was moving on the day of the shooting and that Rucker was with them. More specifically, Anisha testified that Rucker was with the family when they received a phone call from Willis that someone had shot up their old house. The district court discounted Harlin's testimony because he admitted he was not comfortable remembering things, but the district court did not make any similar credibility finding about the testimony of Rucker's sister.

Dyer also testified that he was helping Rucker's family move that day. As part of the move, Dyer drove Rucker in his pickup truck back to the old house to get some things the family had left behind. Rucker's sisters did not deny that Dyer and Rucker went back to the old house as part of the move; they just were not asked questions about it. Dyer testified that Rucker had "a few words" with Willis at the old house, but he denied that Rucker threatened Willis. Dyer testified that he and Rucker left the old house in his truck and that Rucker could not have returned five minutes later to shoot up the house, as Willis testified at trial, because Rucker was riding in the truck with him at that time.

The testimony from Rucker's family members and from Dyer was consistent on one important point—Rucker was with them on the day of the shooting helping the family move to a new house. Dyer was the most important witness because he could pinpoint Rucker's location at the actual time of the shooting. Willis' trial testimony was clear and undisputed that the shooting happened about five minutes after Rucker left the house Willis was cleaning. Dyer was adamant that Rucker could not have returned to do the shooting because Rucker was with him in his truck at that time. Anisha testified that

16

by the time Willis called—presumably sometime later—about the house being shot up, Rucker was with the family at their new house. There is nothing materially inconsistent about the testimony of Rucker's alibi witnesses at the hearing. Rucker was with Dyer and the rest of his family helping them move, and he never returned to Willis' house after he left the house in Dyer's pickup truck. Thus, substantial competent evidence does not support the district court's finding that Rucker presented inconsistent alibis.

At Rucker's trial, Willis was the only witness who identified Rucker as the shooter. The other witnesses with Willis that day identified Rucker as the man having an argument with Willis before the shooting, but they did not see the shooter. Willis testified that when Rucker returned five minutes after their argument to do the shooting, he was in a different vehicle than the pickup truck he was in when he left the house. There was no physical evidence tying Rucker to the shooting, and law enforcement never recovered a weapon for testing. Fantroy testified at trial that he was present when the shooting happened, and Rucker was not the shooter. Apparently, the jury found Willis' testimony more credible than Fantroy's testimony. But would the outcome of the trial have been the same had Rucker been allowed to call at least four witnesses to testify that Rucker was with them at or near the time of the shooting?

The State argues that the outcome of the trial would not have been different because Rucker's witnesses all have bias problems because of their relationship to Rucker. And Dyer's testimony could be challenged based on Rucker's statement to police that he did not know the name of the friend who drove him to Willis' house in the green pickup truck. But Rucker does not have to prove with certainty that the outcome of the trial would have been different to show prejudice. The standard for ineffective assistance of counsel is whether there is a *reasonable probability* the jury would have reached a different result without the deficient performance. *Sola-Morales*, 300 Kan. at 882. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case. *Butler*, 307 Kan. at 853.

17

Considering the totality of the evidence in the record, we find the confidence in the outcome of Rucker's case is sufficiently undermined by the fact that at least four witnesses were not allowed to testify at trial that Rucker was with them at or near the time of the shooting. This is especially true when the State's case consisted of only one eyewitness identifying Rucker as the shooter with no physical evidence to corroborate the eyewitness testimony. Plus, Rucker reasonably explained that he did not testify at his trial that he was with his family and Dyer when the shooting happened because he thought it would be confusing if he could not call these witnesses to corroborate his testimony. Rucker did not receive a fair trial because his counsel failed to timely file the alibi notice for no apparent reason. We find the district court erred in denying Rucker's ineffective assistance of counsel claim on the alibi issue, and we need not reach Rucker's ineffective assistance of counsel claim on the sentencing issue. Rucker should receive the relief he seeks under K.S.A. 60-1507. As a result, we reverse the district court's judgment and remand with directions to grant Rucker a new trial.

Reversed and remanded with directions.